Commonwealth *v.* Pierce, Appellant.

Argued November 17, 1972. Before EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

reargument refused May 3, 1973.

*R. Stuart Jenkins,* with him *Schroeder, Jenkins & Raymond,* for appellant.

*Ralph B. D'Iorio,* Assistant District Attorney, with him *William R. Toal,* First Assistant District Attorney, and *Stephen J. McEwen, Jr.,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE EAGEN, March 16, 1973:

On January 16, 1970, the appellant, Alan D. Pierce, was convicted by a jury in Delaware County of murder in the first degree and the punishment was fixed at death.[1]  A motion for a new trial was denied and sen-

---

[1] At the same trial, Pierce was also convicted of robbery, violation of the Uniform Firearms Act, two counts of carrying a con-

tence was imposed as the jury directed. This appeal followed.

The prosecution stemmed from the attempted robbery of John Courtney and Joseph O'Brien, Esq., while they were walking along a public street in Media, about 8:30 p.m. on April 7, 1969.

Several assignments of error are asserted, but only one need concern us.

Prior to the trial Pierce filed a motion for a change of venue alleging he could not receive a fair trial by an impartial jury in Delaware County, because of the nature and quantity of the publicity which attached to the crime and his arrest. After a hearing the motion was denied. We have reviewed the evidence presented to the lower court in support of the application for a change of venue and now rule a change of venue should have been granted, and on this basis we reverse.

Because of the nature of the crimes and the fact that one of the victims was a seminarian and the other a practicing lawyer in Delaware County, the incident received wide coverage in the newspapers, and on radio and television. While much of the publicity was routine, factual, and wholly lacking in inflammatory content, a great deal of publicity about Pierce was emotionally charged and inflammatory, and clearly pointed to his guilt. A brief review of some of the inflammatory news coverage will show the quality of the publicity. In one story the police were quoted as stating Pierce had been arrested, and he verbally confessed to the double shooting. The story read: "[Police] He's the triggerman. . . . He admitted it and now he's crying and weeping." The story went on to state; "Police said Pierce's record dates to 1963 and included arrests for car theft, assault and battery and carrying a con-

---

cealed deadly weapon, assault and battery, assault and battery with intent to kill and conspiracy. All of the charges arose from the same occurrence.

cealed deadly weapon. . . . He reportedly served time in the state juvenile center in Dallas, Pa." Another story was entitled, "Two Youths Re-enact Media Street Attack." This story reported a staged re-enactment of the crime and read: "Speaking softly, Pierce who Police say has confessed to being the 'triggerman' described how the three youths encountered the victims and then indicated where the victims fell after their attack." Accompanying this story was a large picture of Pierce flanked by a policeman with a caption which read: "Alan Pierce indicates for C.I.D. Detective Edward Smith where one of the victims fell." Another article was titled, "Third Youth Held in Media, Chester Man, 20, Admits Being Gunman, Chief Says."

Striking the balance between the right to a fair trial and the equally important right of free press has long been a complex and troublesome problem. See generally Symposium—A Free Press and a Fair Trial, 11 Vill. L. Rev. 677 (1966). The news media must be given wide latitude in reporting material about criminal trials, since the foundation of our society rests on freedom of thought and discussion. In *Sheppard v. Maxwell*, 384 U.S. 333, 86 S. Ct. 1507 (1966), Mr. Justice CLARK, speaking for the majority of the United States Supreme Court, recognized the importance and the need for a free and responsible press stating: "The principle that justice cannot survive behind walls of silence has long been reflected in the 'Anglo-American distrust for secret trials.' In re Oliver, 333 U.S. 257, 268, 68 S. Ct. 499, 92 L. Ed. 682 (1948). A responsible press has always been regarded as the handmaiden of effective judicial administration, especially in the criminal field. Its function in this regard is documented by an impressive record of service over several centuries. The press does not simply publish information about trials but guards against the miscarriage of justice by subjecting the police, prosecutors, and judicial

processes to extensive public scrutiny and criticism. This Court has, therefore, been unwilling to place any direct limitations on the freedom traditionally exercised by the news media for '[w]hat transpires in the court room is public property.' Craig v. Harney, 331 U.S. 367, 374, 67 S. Ct. 1249, 1254, 91 L. Ed. 1546 (1947). The 'unqualified prohibitions laid down by the framers were intended to give to liberty of the press . . . the broadest scope that could be countenanced in an orderly society.' Bridges v. State of California, 314 U.S. 252, 265, 62 S. Ct. 190, 195, 86 L. Ed. 192 (1941)." Id. at 349-50, 86 S. Ct. at 1515-16. However, the publication of news accounts cannot interfere with the orderly administration of criminal justice. Mr. Justice HOLMES stated the following in *Patterson v. Colorado*, 205 U.S. 454, 27 S. Ct. 556 (1907): "The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print." Id. at 462, 27 S. Ct. at 558.[2] We rule the basic theory of our

---

[2] In *Sheppard*, supra, Mr. Justice CLARK stated: "But the Court has also pointed out that '[l]egal trials are not like elections, to be won through the use of the meeting-hall, the radio, and the newspaper.' Bridges v. State of California, supra, 314 U.S. at 271, 62 S. Ct. at 197. And the Court has insisted that no one be punished for a crime without 'a charge fairly made and fairly tried in a public tribunal free of prejudice, passion, excitement, and tyrannical power.' Chambers v. State of Florida, 309 U.S. 227, 236-237, 60 S. Ct. 472, 477, 84 L. Ed. 716 (1940). 'Freedom of discussion should be given the widest range compatible with the essential requirements of the fair and orderly administration of justice.' Pennekamp v. State of Florida, 328 U.S. 331, 347, 66 S. Ct. 1029, 1037, 90 L. Ed. 1295 (1946). But it must not be allowed to divert the trial from the 'very purpose of a court system . . . to adjudicate controveries, both criminal and civil, in the calmness and solemnity of the courtroom according to legal procedures.' Cox v. State of Louisana, 379 U.S. 559, 583, 85 S. Ct. 466, 471, 13 L. Ed. 2d 487 (1965) (BLACK, J., dissenting). Among these 'legal pro-

system of criminal justice has been violated in the instant case. For the lower court to refuse a motion for a change of venue after the community had been informed by the authorities that Pierce was the confessed "triggerman" with a past record for violent crimes, as well as pictures of a staged re-enactment of the crime—which is a confession in itself—coupled with the other widespread publicity was a denial of due process of law.

It has been recognized by the United States Supreme Court that under normal circumstances a claim of a due process violation requires a showing of identifiable prejudice to the accused. Nevertheless, there are certain procedures employed by the states which involve such a probability of prejudice that they are deemed inherently lacking in due process. See *Sheppard v. Maxwell*, supra; *Estes v. Texas*, 381 U.S. 532, 85 S. Ct. 1628 (1965); *Turner v. Louisiana*, 379 U.S. 466, 85 S. Ct. 546 (1965); *Rideau v. Louisiana*, 373 U.S. 723, 83 S. Ct. 1417 (1963); and by this Court, see *Commonwealth v. Stewart*, 449 Pa. 50, 295 A. 2d 303 (1972). We hold that the nature of the accounts released by the police were so "inherently prejudicial" that Pierce need not have shown a nexus between the publicity and actual jury prejudice, and hence, he did not have the burden of showing identfiable prejudice.

We find the instant case analagous to the United States Supreme Court case of *Rideau v. Louisiana*, supra. In *Rideau*, the police staged a filmed interview

---

cedures' is the requirement that the jury's verdict be based on evidence received in open court, not from outside sources. Thus, in Marshall v. United States, 360 U.S. 310, 79 S. Ct. 1171, 3 L. Ed. 2d 1250 (1959), we set aside a federal conviction where the jurors were exposed 'through news accounts' to information that was not admitted at trial. We held that the prejudice from such material 'may indeed be greater' than when it is part of the prosecution's evidence "for it is then not tempered by protective procedures.' " 384 U.S. at 350-51, 86 S. Ct. at 1516.

with the accused in which he admitted committing a bank robbery, kidnapping, and murder, and the "interview" was shown over the local television stations. In condemning such a practice, Mr. Justice STEWART, speaking for the majority of the Court, stated: "In the view we take of this case, the question of who originally initiated the idea of the televised interview is, in any event, a basically irrelevant detail. For we hold that it was a denial of due process of law to refuse the request for a change of venue, after the people of Calcasieu Parish had been exposed repeatedly and in depth to the spectacle of Rideau personally confessing in detail to the crimes with which he was later to be charged. For anyone who has ever watched television the conclusion cannot be avoided that this spectacle, to tens of thousands of people who saw and heard it, in a very real sense *was* Rideau's trial—at which he pleaded guilty to murder. Any subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality." 373 U.S. at 726, 83 S. Ct. at 1419. We believe that much of what was said in *Rideau* is applicable herein. In the instant case, as in *Rideau,* we believe that the deliberate release of the information that Pierce was the confessed "triggerman" in the double shooting, as well as the staged reenactment of the crime "in a very real sense *was* [Pierce's] trial at which he pleaded guilty to murder." All the information released by the authorities clearly pointed to Pierce's guilt, and any prospective juror exposed to this publicity must surely have formed a definite opinion as to Pierce's guilt or innocence. Moreover, some of the information, such as the accused's past criminal record, was not admissible at trial, but it was available to the prospective jurors through the news account.[3] In the constitutional sense a fair trial

---

[3] In Marshall v. United States, 360 U.S. 310, 79 S. Ct. 1171 (1959), the Supreme Court in the exercise of its supervisory powers

necessarily demands the evidence developed against the accused shall come from the witness stand in a public tribunal with the full judicial protection of such rights as: counsel, cross-examination, confrontation, and the right against self-incrimination.[4] These safeguards could not have been afforded the appellant, they

---

decided the exposure of jurors through newspaper articles to the accused's prior record required a new trial stating: "The trial judge has a large discretion in ruling on the issue of prejudice resulting from the reading by jurors of news articles concerning the trial. Holt v. United States, 218 U.S. 245, 251, 31 S. Ct. 2, 6, 54 L. Ed. 1021. Generalizations beyond that statement are not profitable, because each case must turn on its special facts. We have here the exposure of jurors to information of a character which the trial judge ruled was so prejudicial it could not be directly offered as evidence. The prejudice to the defendant is almost certain to be as great when that evidence reaches the jury through news accounts as when it is a part of the prosecutor's evidence. Cf. Michelson v. United States, 335 U.S. 469, 475, 69 S. Ct. 213, 218, 93 L. Ed. 168. It may indeed be greater for it is then not tempered by protective procedures." Id. at 312-13, 79 S. Ct. at 1173.

[4] In *Irvin v. Dowd*, 366 U.S. 717, 81 S. Ct. 1639 (1961), Mr. Justice CLARK stated the following: "In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process. In re Oliver, 333 U.S. 257, 68 S. Ct. 499, 92 L. Ed. 682; Tumey v. State of Ohio, 273 U.S. 510, 47 S. Ct. 437, 71 L. Ed. 749. 'A fair trial in a fair tribunal is a basic requirement of due process.' In re Murchison, 349 U.S. 133, 136, 75 S. Ct. 623, 625, 99 L. Ed. 942. In the ultimate analysis, only the jury can strip a man of his liberty or his life. In the language of Lord Coke, a juror must be as 'indifferent as he stands unsworn.' Co. Litt. 155b. His verdict must be based upon the evidence developed at the trial. Cf. Thomas v. City of Louisville, 362 U.S. 199, 80 S. Ct. 624, 4 L. Ed. 2d 654. This is true, regardless of the heinousness of the crime charged, the apparent guilt of the offender or the station in life which he occupies. It was so written into our law as early as 1807 by Chief Justice MARSHALL in 1 Burr's Trial 416 (1807). 'The theory of the law is that a juror who has formed an opinion cannot be impartial.' Reynolds v. United States, 98 U.S. 145, 155, 25 L. Ed. 244." Id. at 722, 81 S. Ct. at 1642.

were precluded from being fully effective by the pre-trial news coverage.

It is not only the fact that the publicity was "inherently prejudicial" that troubles us about this case—it is also the source of the publicity. The information in this case was not reported as a result of independent research by the representatives of the news media—it came directly from the police. It was the authorities who released the fact that Pierce was the confessed "triggerman" with a past record, and the police who staged the "re-enactment" of the crime. Moreover, the District Attorney's Office is not free from some blame for the aroused tone of the community because his office released statements such as: "I am waiting for the misguided social worker to begin a fast and vigil at the hospital beds of these most recent victims of savage lawlessness. When the robbers are captured, I promise them a swift and very special treatment." The District Attorney's Office also refused to produce witnesses at an arraignment because of alleged telephone threats to the victims of "ultimate death".

Statements such as those of the police and the prosecutor in this case create an even more substantial risk of a denial of a fair trial, because of the position in the community these individuals hold, and also suggest an official disregard of safeguards inherent in a fair trial. Officers of the Commonwealth and the police have a special duty and responsibility to *all* of the citizens of the Commonwealth. They must never lose sight of the fact that an accused has a right to a fair trial by an impartial jury, that only a jury can "strip a man of his liberty", and a man is presumed innocent until *proven guilty in a court of law,* and that all men are guaranteed basic rights under the Constitution.

In *Berger v. United States,* 295 U.S. 78, 55 S. Ct. 629 (1935), the Supreme Court spoke of the special

duty of a United States Attorney; we believe the language appropriately applies to any officer involved in a criminal investigation or prosecution. The Court stated: "The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." Id. at 88, 55 S. Ct. at 633.[5] This standard was violated in the present case.

---

[5] In *Stroble v. California*, 343 U.S. 181, 72 S. Ct. 599 (1952), Mr. Justice FRANKFURTER, dissenting, stated the following:

"Thus, on the California court's own reading of the record, circumstances tending to establish guilt and adduced outside the courtroom before the trial had even begun were avidly exploited by press and other media, actively promoted by the prosecutor. The State court sanctioned this as not only permissible but as an inevitable ingredient of American criminal justice. That sanction contradicts all our professions as to the establishment of guilt on the basis of what takes place in the courtroom, subject to judicial restrictions in producing proof and in the general conduct of the proceedings. Jurors are of course human beings and even with the best of intentions in the world they are in the well-known phrase of HOLMES and HUGHES, JJ., 'extremely likely to be impregnated by the environing atmosphere.' Frank v. Mangum, 237 U.S. 309, 345, 349, 35 S. Ct. 582, 594, 595, 596, 59 L. Ed. 969. Precisely because the feeling of the outside world cannot, with the utmost care, be kept wholly outside the courtroom, every endeavor must be taken in a civilized trial to keep it outside. To have the prosecutor himself feed the press with evidence that no self-restrained press ought to publish in anticipation of a trial is to make the State itself through the prosecutor, who wields its power, a conscious participant in trial by newspaper, instead of by those methods which centuries of experience have shown to be indispensable to the fair administration of justice.

. . .

". . . To allow such use of the press by the prosecution as the California court here left undisciplined, implies either that the ascertainment of guilt cannot be left to the established processes

In accordance with these views, we rule that in this Commonwealth policemen and members of the staffs of the office of District Attorneys shall not release to the news media: (a) the existence or contents of any statement or confession given by the accused, or his refusal to give a statement or to take tests; (b) prior criminal records of the accused, including arrests and convictions; (c) any inflammatory statements as to the merits of the case, or the character of the accused; (d) the possibility of a plea of guilty; (e) nor shall the authorities deliberately pose the accused for photographs at or near the scene of the crime, or in photographs which connect him with the scene of the crime. See generally ABA Project on Minimum Standards for Criminal Justice, Standards Relating to Fair Trial and Free Press. §§1.1 and 2.1 (Approved Draft 1968).

We hold that anything short of compliance with these standards can operate to deprive an accused of due process of law, as this type of material did in the instant case. Moreover, we strongly suggest that trial courts employ the precautions set forth in *Sheppard v. Maxwell*, supra, and *Commonwealth v. Hoss*, 445 Pa. 98, 283 A. 2d 58 (1971).

Judgment reversed and a new trial is ordered.

Mr. Chief Justice JONES took no part in the consideration or decision of this case.

---

of law or impatience with those calmer aspects of the judicial process which may not satisfy the natural, primitive popular revulsion against horrible crimes but do vindicate the sober second thoughts of a community. If guilt here is clear, the dignity of the law would be best enhanced by establishing that guilt wholly through the processes of law unaided by the infusion of extraneous passion. The moral health of the community is strengthened by according even the most miserable and pathetic criminal those rights which the Constitution has designed for all." Id. at 200-02, 72 S. Ct. at 609-10.