365 A.2d 871

COMMONWEALTH of Pennsylvania

v.

Hugh Gerard HERRON, Appellant.

Superior Court of Pennsylvania.

Nov. 22, 1976.

322

Leonard G. Ambrose, III, Erie, for appellant.

Robert H. Chase, Dist. Atty., Charles D. Agresti, Asst. Dist. Atty., Erie, for appellee.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

CERCONE, Judge:

This is an appeal from the judgment of sentence imposed upon Hugh "Red" Herron following his conviction by a jury of possession with intent to deliver controlled substances [1] and possession of controlled substances.[2] Appellant asserts numerous assignments of alleged error including the refusal of a change of venue, the admission of evidence seized as a result of a search, the admission into evidence of contraband obtained by an informer, limitations on the scope of voir dire, and denial of a closed voir dire examination.

1. Act of April 14, 1972, P.L. 233, No. 64, § 13(a)(30) as amended October 26, 1972, P.L. 1048, No. 263, § 1, 35 P.S. § 780–113(a)(30) (Supp.1975–76).

2. *Id.*, § 13(a)(16), 35 P.S. § 780–113(a)(16) (Supp.1975–76).

The record establishes that on February 22, 1974, at approximately 2:00 P.M., a confidential informant advised Detective Sergeant William Loesch of the Millcreek Township Police Department, Erie County, that he had recently observed a large quantity of drugs at the appellant's residence. Sergeant Loesch asked the informant what specific drugs he had seen and whether he was presently in possession of any. The informer responded that he did not have any of the drugs, but believed that he could obtain some cocaine. Acting upon this information, Sergeant Loesch first verified that the informant did not have any drugs on his person, and then followed him to a location where he could observe the informer entering the appellant's house yet remain undetected. On their first visit no one answered at the house. A short time later, however, they returned and the informer was admitted into the house. Approximately five minutes later, the informant came out and returned with eight individually wrapped packets, each containing a white powdery substance. Subsequent laboratory analysis established that the substance was cocaine. Sergeant Loesch then proceeded to obtain a warrant authorizing a search of appellant's residence. Shortly thereafter, appellant's home was searched and various drugs were seized.

## I. Change of Venue

Appellant first contends that the court below abused its discretion in refusing to grant a change of venue. Hearings were held on this matter on June 12 and 28, of 1974. The evidence presented at these hearings consisted of seventeen separate items disseminated in the Erie County area via newspaper or television between February 23, 1974 and June 1, 1974. Appellant argues that this pre-trial publicity was so inflammatory that it precluded him from receiving a fair trial in Erie County. Specifically, appellant cites three instances of

alleged inflammatory publicity which compelled a change of venue. First, and foremost, according to appellant, was a television broadcast on April 19, 1974, which quoted a judge of the Court of Common Pleas of Erie County as stating that appellant is a "danger to the community." Secondly, appellant directs our attention to two television interviews that occurred in March and April of 1974, in which the Erie County district attorney commented on the fact that appellant had recently been convicted on another drug offense[3] and the Commonwealth would ask that his bail be revoked. Appellant also notes that there were news articles which reported appellant's prior conviction. Appellant submits that in view of the source of the first two of the above items, a new trial is mandated under *Commonwealth v. Pierce*, 451 Pa. 190, 303 A.2d 209 (1973).

In *Pierce,* our Supreme Court, per Mr. Justice Eagen, held inter alia, "that in this Commonwealth policemen and members of the staffs of the office of District Attorneys shall not release to the news media: (a) the existence or contents of any statement or confession given by the accused, or his refusal to give a statement or to take tests; (b) prior criminal records of the accused including arrests and convictions; (c) any inflammatory statements as to the merits of the case, or the character of the accused; (d) the possibility of a plea of guilty; (e) nor shall the authorities deliberately pose the accused for photographs at or near the scene of the crime, or in photographs which connect him with the scene of the crime." (Citation omitted.) *Pierce,* 451 Pa. at 200, 303 A.2d at 215. However, in *Commonwealth v. Nahodil,* 462 Pa. 301, 306, 341 A.2d 91, 93 (1975), the court, again speaking through Mr. Justice Eagen, explained: "[I]n *Pierce,* we condemned and proscribed the practice of police and

---

3. Appellant was convicted on February 12, 1974, and was free on bail pending sentencing when he was arrested for the instant offenses on February 22, 1974.

law enforcement agents in releasing to the news media the existence and contents of statements or confessions given by those accused of crime. *However, a violation of our ruling in Pierce does not necessarily mandate a new trial. It must also appear that the news accounts were so 'inherently prejudicial' that the possibility of a fair trial was questionable."* [Emphasis supplied.] In the case at bar, we find that the news accounts in question did not compel such a probability of prejudice to appellant that they can be classified as "inherently prejudicial." See *Pierce,* supra.

Appellant was brought to trial in September of 1974, almost seven months following his arrest. In *Commonwealth v. Hoss,* 445 Pa. 98, 106, 283 A.2d 58 (1971), the court found it significant that there was a "lengthy time period" of five months between arrest and trial. Furthermore, the extent of the pre-trial publicity in the present case did not approach the dimensions of that in *Hoss.* More importantly, we are in complete accord with the lower court's ruling that the reporting was factual in nature and not inflammatory.

The argument that the Honorable Fred P. Anthony's statement (that appellant is a "danger to the community") necessitated a change of venue is specious. The statement, or more accurately the finding, was made in the course of a bail revocation hearing. Rule 4010(A)(2)(iii) of the Pennsylvania Rules of Criminal Procedure, specifically provides for such a finding. The attempt of counsel for appellant to portray this finding as an isolated statement which "is tantamount to a conviction without a trial," exceeds the limits of proper advocacy. Moreover, the amount of news coverage given to the finding was so insignificant and removed in time as to dissipate any possibility of actual prejudice.

With respect to the contention that the television interviews in which the district attorney commented on appel-

lant's recent conviction for a similar offense, we again conclude that these accounts were not so "inherently prejudicial" as to cast doubt upon the possibility of appellant receiving a fair trial. *Commonwealth v. Nahodil,* supra. The interviews were conducted at least five months prior to trial and, therefore, "there was time for the effect of these new stories to fade from the minds of prospective jurors." *Commonwealth v. Powell,* 459 Pa. 253, 260, 328 A.2d 507, 511 (1974); *Commonwealth v. Nahodil,* supra. Furthermore, the interviews were conducted in connection with the Commonwealth's efforts to revoke appellant's bond on his recent prior conviction. This was not an intentional attempt by the district attorney to jeopardize appellant's chances of receiving a fair trial by releasing inflammatory information, rather it was simply a factual disclosure that the Commonwealth was seeking revocation of appellant's bond in light of his recent arrest.

In addition, all prospective jurors were questioned as to whether they had heard or read any newspaper, television or radio accounts relating to appellant's case. See *Commonwealth v. Martin,* 465 Pa. 134, 348 A.2d 391 (1975); *Commonwealth v. Nahodil,* supra. Any prospective jurors who acknowledged that they had read or heard of the case was further questioned as to whether they had formed fixed opinions regarding appellant's guilt or innocence. Only one juror responded affirmatively to this inquiry and was then excused. Furthermore, as pointedly noted by the lower court, "if defendant had found evidence of prejudice existing at the time he voir dired the jury, he could have renewed his [change of venue] motion at that time." Cf. *Commonwealth v. Martin, supra.* On this record, we cannot find that the lower court abused its discretion in refusing appellant's motion for a change of venue. *Commonwealth v. Richardson,* 392 Pa. 528, 140 A.2d 828 (1958); *Commonwealth v. Lopinson,* 427 Pa. 284, 234 A.2d 552

(1967); *Commonwealth v. Hoss, supra; Commonwealth v. Martin, supra.*

## II. *Voir Dire*

Appellant also argues that the trial court abused its discretion in two instances relating to the voir dire examination of prospective jurors. It is contended that the court erred in prohibiting specific inquiry into what each potential juror may have heard or read about the case and in refusing a motion for individual voir dire. In neither case can we conclude that the lower court acted in abuse of its discretion.

Prior to the commencement of the jury selection, appellant's counsel requested that the voir dire of prospective jurors be conducted individually and outside the presence of other potential jurors. Following the refusal of this request, appellant submitted thirteen proposed questions for voir dire. The majority of the questions were approved. Appellant argues, however, that the court erred in refusing counsel permission to inquire of the jurors what exactly, if anything, they had read or heard about appellant via the news media. Instead, the lower court allowed counsel to ask the prospective jurors whether they had heard or read any television, newspaper or radio reports relating to appellant. If a juror responded affirmatively counsel was permitted to further inquire whether as a result of this publicity the juror had formed a fixed opinion as to the guilt or innocence of appellant. The only juror to acknowledge having a fixed opinion was excused for cause.[4] Nonetheless, appellant maintains that this procedure was inadequate because it permitted the jurors to subjectively assess their own impartiality.

4. At least three of the jurors who ultimately served, acknowledged to having read or heard news accounts relative to appellant. All three, however, disclaimed any fixed opinion as to guilt or innocence.

In support of his position that the trial court should have granted his motion for individual voir dire and inquired into the specific content of the publicity that the prospective jurors were exposed to, appellant relies upon the recommendation of the American Bar Association Project on Minimum Standards for Criminal Justice, Standards Relating to Fair Trial and Free Press, § 3.-4(a) & (b) (Approved Draft, March 1968). These standards provide:

"3.4 Selecting the jury.

It is recommended that the following standards be adopted in each jurisdiction to govern the selection of a jury in those criminal cases in which questions of possible prejudice are raised.

(a) Method of examination.

Whenever there is believed to be a significant possibility that individual talesmen will be ineligible to serve because of exposure to potentially prejudicial material, the examination of each juror with respect to his exposure shall take place outside the presence of other chosen and prospective jurors. An accurate record of this examination shall be kept, by court reporter or tape recording whenever possible. *The questioning shall be conducted for the purpose of determining what the prospective juror has read and heard about the case and how his exposure has affected his attitude towards the trial,* not to convince him that he would be derelict in his duty if he could not cast aside any preconceptions he might have.

(b) Standard of acceptability.

Both the degree of exposure and the prospective juror's testimony as to his state of mind are relevant to the determination of acceptability. A prospective juror who states that he will be unable to overcome his preconceptions shall be subject to challenge for cause no matter how slight his exposure. If he has seen or

heard and remembers information that will be developed in the course of trial, or that may be inadmissible but is not so prejudicial as to create a substantial risk that his judgment will be affected, his acceptability shall turn on whether his testimony as to impartiality is believed. If he admits to having formed an opinion, he shall be subject to challenge for cause unless the examination shows unequivocally that he can be impartial. A prospective juror who has been exposed to and remembers reports of highly significant information, such as the existence or contents of a confession, or other incriminating matters that may be inadmissible in evidence, or substantial amounts of inflammatory material, shall be subject to challenge for cause without regard to his testimony as to his state of mind." [Emphasis added.]

\* \* \* \* \* \* \* \*

Appellant also directs our attention to two federal decisions which embraced the method of voir dire recommended in Section 3.4, *Id.* In *Silverthorne v. United States*, 400 F.2d 627 (9th Cir. 1968), there was voluminous pre-trial publicity surrounding the insolvency of a national bank of which the defendant was president. Every prospective juror had some knowledge of the case. Before 12 jurors were finally selected, 43 had to be excused—19 of which expressed opinions as to the defendant's guilt. Under these circumstances, the Ninth Circuit Court of Appeals held that the trial court should have made an "effort to ascertain *what* information the jurors had accumulated" because otherwise it "had no way of objectively assessing the impact caused by this pretrial knowledge on the juror's impartiality." [Footnote omitted.] *Id.* at 638.

In *United States v. Addonizio*, 451 F.2d 49 (3rd Cir. 1972), cert. denied 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972), several public officials, including the Mayor of Newark, New Jersey, were charged with extorting

kickbacks from contractors and suppliers engaged in public work projects. The voir dire in that case consisted of questions designed to reveal the nature and extent of each prospective juror's exposure to pretrial publicity. The jurors were cautioned, however not to disclose the *substance* of what they had heard or read. The prospective jurors were then questioned as to whether they harbored any opinion as to guilt or innocence and whether they could judge the defendants impartially despite their exposure to pretrial publicity. In addition, the trial court dismissed on its own motion any prospective juror who had been extensively exposed to pretrial publicity notwithstanding protestations of impartiality. The court of appeals also noted that the publicity "was neither virulent nor inflammatory, and no empanelled juror admitted having formed an opinion about the case." *Id.* at 66. On these facts, the court concluded that the defendants had been tried by an impartial jury and the voir dire was not constitutionally infirm. Nevertheless, the Third Circuit Court of Appeals found the method of voir dire recommended in Section 3.4(a) *supra,* to be highly commendable and, accordingly, recommended that in the future that method be employed by the district courts in the Third Circuit.

■■ Initially, it must be recognized that the Pennsylvania Rules of Criminal Procedure require that individual voir dire only be conducted in capital cases. Pa. R.Crim.P., Rule 1106(e).[5] The question of whether individual and closed voir dire is necessary in non-capital cases rests within the sound discretion of the trial judge. In the case at bar, we find that the publicity was not so substantial that we can conclude that the trial judge

5. When appellant was brought to trial in September of 1974, former Rule 1107 governed the examination of prospective jurors in non-capital cases. On July 2, 1975, former Rules 1106 and 1107 were combined. The former rules, however, also left the question of individual and closed voir dire in noncapital cases to the discretion of the trial judge.

abused his discretion in refusing appellant's motion for individual and closed voir dire.

Although the procedures prescribed in Section 3.4 have obvious merit in certain cases, we do not believe that a trial judge must invoke these procedures in every case where the defendant advances a claim of prejudicial pretrial publicity. Indeed, it appears that Section 3.4 contemplates that its recommended procedures be followed only "[w]henever there is believed to be a *significant possibility* that individual talesmen will be ineligible to serve because of exposure to potentially prejudicial material. . . ." [Emphasis added.]

In *United States v. Polizzi,* 500 F.2d 856 (9th Cir. 1974), the Ninth Circuit Court of Appeals had occasion to elaborate upon their decision in *Silverthorne,* supra. The court did not retreat from its holding in *Silverthorne,* but rather distinguished it on the grounds that the publicity in *Polizzi* was not substantial enough to compel the trial court to apply the more probing voir dire detailed in *Silverthorne. United States v. Polizzi,* supra at 879. The Ninth Circuit concluded that:

"We find, however, that the pretrial publicity in this case was not substantial enough to have required the trial judge to interrogate the prospective jurors at length about it. The judge was aware of the publicity, and clearly it was his judgment that the pretrial publicity was not a significant danger to a fair trial. His concern seemed greater about the possible effects of publicity during trial. The pretrial publicity in this case does not resemble the situation in *Silverthorne v. United States,* 400 F.2d 627, 639 (1968). Unless a trial judge clearly has erred in his estimation of the action needed to uncover and prevent prejudice from pretrial publicity, an appellate court should not intervene and impose its estimate. The court closest to the situation can best evaluate the proper way to walk the difficult line between a vigorous voir dire to determine

any possible bias and avoidance of creating bias by specific questions which add 'fuel to the flames' in suggesting the presence of controversial issues. *Beck v. Washington*, 369 U.S. 541, 548, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962). The court below did not abuse its discretion by the way it handled the question of pretrial publicity." [Footnote omitted.] *Polizzi*, 500 F.2d at 880.

Similarly, in the case at bar we find that the pretrial publicity was not so substantial as to require a conclusion that the trial judge abused his discretion in refusing appellant's request that each prospective juror be examined as to the content of the publicity they had been exposed to.

### III. Suppression of Evidence

Appellant next argues that the lower court erred in denying his motion to suppress evidence seized from his home pursuant to a search warrant. In particular, appellant contends that the affidavit for the warrant did not establish probable cause because the issuing authority was not sufficiently informed of the underlying circumstances from which the affiant concluded that the informant was credible or his information reliable. *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). See also *Spinelli v. United States*, 393 U.S. 410, 413, 89 S.Ct. 584, 21 L.Ed.2d 637 (1968). In other words, appellant contends that the second prong of the *Aguilar-Spinelli* test was not satisfied. We conclude otherwise.

In the affidavit the affiant recited that he:

"Received information from a confidential, reliable informant, who has given information on several occasions which was checked and verified by this officer and was ascertained to be true and correct, that the above mentioned individual has in his possession a large quantity of cocaine. The informant was at the

above residence and did see cocaine there within the last six hours. Informant also stated that the cocaine was kept at the rear of the house in the garage or one of the vehicles. Informant also stated that he did observe a quantity of marihuana in the house.

"On the following dates surviellance [sic] was conducted on the above residence by MPD myself and Det. Negosky, EPD Det's Bagnoni and DiPaolo, and Strickland. 26 Jan. 1974 2130 hrs. to midnight. 1 Feb. 1974 1400 hrs. to midnight. 2 Feb. 1974 8000 hrs. to midnight. Also periodical surviellance [sic] was done on the following date [sic] of Febraury [sic] 4, 5, 6, 7, 8, 9, 10, & 11. During the surviellance [sic] we observed a large no. of users and dealers of narcotics going to and from this residence. Also on 1 Nov. 72 Trooper G. Hooker of the Penna. State Police did buy approx. one pound of marihuana from Hugh "Red" Herron, and he was found guilty in Court (Erie Co.) of sales of marijuana on 2/12/74 and is currently out on $5,000 bond awaiting sentencing."

Appellant stresses the fact that a mere assertion that the informer was reliable in the past does not satisfy the *Aguilar-Spinelli* test. See *Commonwealth v. Hall*, 451 Pa. 201, 302 A.2d 342 (1973), and cases cited therein. Appellant further emphasizes that Rule 2003 of the Pennsylvania Rules of Criminal Procedure now provides that the issuing authority is not to consider any evidence not contained in the affidavit(s) when determining whether probable cause has been established.[6] See *Commonwealth v. Burke*, 235 Pa.Super. 36, 340 A.2d 524 (1975). Undoubtedly the latter two propositions are correct statements of law. It is also true, however, that the critical test of whether an informer is credible or his information reliable, may be satisfied in several ways.

6. In the case at bar it should be noted that if the affiant had reduced to writing even a small portion of some of the additional crucial information he orally conveyed to the issuing authority, the instant issue would never have arisen.

In *Commonwealth v. Ambers*, 225 Pa.Super. 381, 386, 310 A.2d 347, 350 (1973), we delineated four criteria to be considered by the issuing authority in his attempt to determine whether a substantial basis exists for crediting the informant's tip: "(1) Did the informant give prior reliable information? (2) Was the informant's story corroborated by any other sources? (3) Were the informant's statements a declaration against [penal] interest? (4) Does the defendant's reputation support the informant's tip?" Accord: *Commonwealth v. Archer*, 238 Pa.Super. 103, 352 A.2d 483 (1975). Moreover, it is not necessary that every factor be satisfied before the warrant may issue. *Commonwealth v. Ambers*, supra. Here two of the four factors were present on the face of the affidavit. Collectively considered, these factors constituted a substantial basis for crediting the informant's tip.

 Rather extensive police surveillance of appellant's residence was conducted for three days between January 26, 1974 and February 2, 1974. In addition, the police arranged for periodic surveillance of the house between February 4, 1974 through February 11, 1974. The surveillance established that a large number of users and traffickers in narcotics were frequenting appellant's residence. Thus, the prior police surveillance and its results tended to corroborate the informant's tip that appellant was in possession of a sizeable quantity of narcotics. In addition the affidavit recites the fact that appellant had been convicted only ten days earlier for a drug offense arising out of his sale of approximately one pound of marijuana to an undercover agent. A suspect's criminal record which reveals prior criminal conduct similar to the offense in question, is a factor to be considered along with other relevant information in determining whether the informant's information is indeed reliable. *United States v. Harris*, 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d

723 (1971).[7] See also *Commonwealth v. Gullett,* 459 Pa. 431, 329 A.2d 513 (1974).

Accordingly, we find that when the informant's tip is considered together with the results of the surveillance and appellant's known reputation as a trafficker in contraband, the issuing authority was supplied with sufficient underlying circumstances to conclude that the informant's information was reliable.

Lastly, appellant argues that the lower court erred in admitting into evidence a quantity of cocaine which the informant had obtained from appellant. This argument is predicated on the following facts:

As previously discussed, Sergeant Loesch was advised by an informant that there was a large quantity of drugs in appellant's home. Sergeant Loesch then asked the informant if there was any way he could substantiate this information. The informant replied that he could presently obtain cocaine from appellant. The Sergeant responded by telling the informer that if he could obtain the cocaine then he, Sergeant Loesch, would proceed from there. Sergeant Loesch and the informant then drove to the appellant's residence in separate vehicles. While the informant sought admission into the home Sergeant Loesch observed him through a pair of binoculars. On their first visit no one was at home. A short time later, however, they made a second trip whereupon the informant was admitted into the home. A few minutes thereafter the informant emerged and drove back to the police station. At the station he turned over to Sergeant

7. As Mr. Chief Justice Burger has stated:
 "We cannot conclude that a policeman's knowledge of a suspect's reputation—something that policemen, frequently know and a factor that impressed such a 'legal technician' as Mr. Justice Frankfurter—is not a 'practical consideration of everyday life' upon which an officer (or a magistrate) may properly rely in assessing the reliability of an informant's tip." *United States v. Harris,* 403 U.S. at 583, 91 S.Ct. at 2081.

Loesch a quantity of cocaine which he had obtained from appellant on consignment.

Appellant now contends, as he did below, that the cocaine was obtained as a result of an unlawful search and seizure and was, therefore, inadmissible.

We cannot accept appellant's contention that the foregoing events constituted a "search." To the contrary, we view the situation simply as a narcotics purchase by a police informant. While at appellant's home the informant did not surreptitiously take anything, nor did he observe or hear anything that appellant wanted him to remain unaware of. Cf. *Gouled v. United States*, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647 (1921). To hold this transaction an unlawful search and seizure would be equivalent to ruling that narcotics purchases by informants or undercover agents are unconstitutional per se, when clearly such is not the case. See *Lewis v. United States*, 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966).

In *Hoffa v. United States*, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966), the Supreme Court had occasion to consider an analogous situation. In *Hoffa* a business acquaintance of the defendant was also a paid government informant. The informant regularly visited the defendant's hotel suite where he was made privy to highly incriminating conversations. The Supreme Court held that testimony regarding these conversations was properly admissible notwithstanding the defendant's contention that by listening the informant had effected an unconstitutional search. The court also rejected the argument that the defendant's consent to the informant's presence was vitiated by the fact that the informant concealed his true role. In holding that no legitimate Fourth Amendment interest had been violated, the court observed that the informant was in the defendant's hotel suite by invitation, and the conversations he heard were

knowingly conducted in his presence. Most importantly, the court concluded that the informant had not violated the defendant's legitimate reliance upon the security of a constitutionally protected area, i. e., the hotel suite. Rather, the informant had violated the defendant's misplaced confidence that he would not reveal the subject of the conversations. "Neither this Court nor any member of it has ever expressed the view that the Fourth Amendment protects a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it." [8] *Hoffa v. United States,* 385 U.S. at 302, 87 S.Ct. at 413.

■ Similarly, in the case at bar we find that the purchase of the narcotics by the police informer at appellant's home did not violate any interest legitimately protected by the Fourth Amendment.[9] Appellant voluntarily agreed to sell the narcotics on consignment to the informant. The only thing violated was appellant's misplaced belief that he was not dealing with a police in-

**8.** The court in *Hoffa,* 385 U.S. at 303, 87 S.Ct. at 414, also quoted with approval the following comment from the dissenting opinion of Mr. Justice Brennan in *Lopez v. United States,* 373 U.S. 427, 465, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963): "The risk of being overheard by an eavesdropper or betrayed by an informer or deceived as to the identity of one with whom one deals is probably inherent in the conditions of human society. It is the kind of risk we necessarily assume whenever we speak."

**9.** In *Lewis v. United States,* 385 U.S. at 211, 87 S.Ct. at 427, the court pertinently remarked that:
"The fact that the undercover agent entered petitioner's home does not compel a different conclusion. Without question, the home is accorded the full range of Fourth Amendment protections. See *Amos v. United States,* 255 U.S. 313, 41 S.Ct. 266, 65 L.Ed. 654 (1921); *Harris v. United States,* 331 U.S. 145, 151, n. 15, 67 S.Ct. 1098, 1102, 91 L.Ed. 1399 (1947). But when, as here, the home is converted into a commercial center to which outsiders are invited for purposes of transacting unlawful business, that business is entitled to no greater sanctity than if it were carried on in a store, a garage, a car, or on the street. A government agent, in the same manner as a private person, may accept an invitation to do business and may enter upon the premises for the very purposes contemplated by the occupant."

formant. This is a risk which a trafficker in contraband necessarily assumes. The informant did not conduct a surreptitious or general search of appellant's residence; he simply took that which appellant intended he would take.

Judgment of sentence affirmed.

SPAETH, J., concurs in the result.