413 A.2d 1003

COMMONWEALTH of Pennsylvania

v.

James TOLASSI, Jack Yocum, James Shirley, Michael O'Brien, Joseph O'Brien, Russ Columbo, Joseph Taylor, Robert Layton, Jr., Richard McLain, Max Hinkel, III, Michael Dolinski, Appellants.

Supreme Court of Pennsylvania.

Argued Dec. 13, 1979.

March 20, 1980.

Reargument Denied May 16, 1980.

44

46

Robert F. Simone, Philadelphia, Morris Gerber, Norristown, for appellants.

John J. Burfete, Asst. Dist. Atty., Wm. T. Nicholas, Norristown, for appellee.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, LARSEN and FLAHERTY, JJ.

## OPINION OF THE COURT

O'BRIEN, Justice.

This is an appeal by eleven individuals, all of whom were convicted, following a jury trial in the Court of Common Pleas, Criminal Division, of Montgomery County, of various criminal offenses. Post-verdict motions were filed and argued before the court en banc, and, on July 31, 1975, an order was entered denying the motions. Hence, this appeal.

The criminal incident from which the instant appeal has arisen was an episode in a continuing struggle between the Philadelphia Building and Construction Trades Council (BTC) and the Altemose Construction Company (hereinafter Altemose) and its president, J. Leon Altemose. As part of that struggle, a large protest demonstration was planned for Monday, June 5, 1972. The site of the demonstration was a plot of land located in Upper Merion Township, Montgomery County, where Altemose was engaged in the construction of a hotel/motion-picture-theater/office building complex. The purpose of the demonstration was to show support for the BTC and to protest the Altemose "open shop" policy of employment of non-union labor, which the BTC contended

was adversely affecting the prevailing wage standards in the Philadelphia area. Thus it was, on June 5, 1972, that workingmen affiliated with the BTC came in busloads and carloads, almost 1,000 strong, to the Upper Merion jobsite, ostensibly to picket.

While most of the men, wearing placards announcing their grievance against Altemose, peacefully picketed on the perimeter of the jobsite, hundreds of others immediately set out to destroy what work had been completed and the equipment at the site, much of which was the property of A. J. Volpi Construction Company, a subcontractor. A chain link "cyclone" fence, eight feet high and approximately 4,500 feet long, was levelled; groups of men leaped upon the fence and by their sheer weight bent it over at the top. They would then walk along the fence toward another group engaged in a similar effort several yards away. The men continued along the fence in this fashion until the entire length of fence surrounding the site was flattened. Temporary office modules, trailers and heavy equipment were set afire and demolished. Security personnel and the police chief of Upper Merion Township and others were stoned. In all, some $300,000 worth of damage was done in little more than a hour. When the destruction was complete, the perpetrators rejoined those picketing peacefully around the perimeter of the site.

Both the numbers of persons involved and the fact that virtually all were strangers in Upper Merion combined to make identification of those who may have engaged in criminal conduct difficult. In the event, however, twenty men were sufficiently identified to lead to their arrest, indictment and trial. The eleven appellants party to the instant case were among a group of fourteen charged, each one, with malicious destruction of fences,[1] riot[2] and conspiracy.[3] Three of the defendants so charged were acquitted by

1. Act of June 24, 1939, P.L. 872, 18 P.S. § 4940, repealed.

2. Act of June 24, 1939, P.L. 872, 18 P.S. § 4401, repealed.

3. Act of June 24, 1939, P.L. 872, 18 P.S. § 4302.

the jury. Eight, appellants Yocum, Shirley, Joseph O'Brien, Columbo, Taylor, Layton, McLain and Hinkel, were convicted of all three offenses. Three, appellants Tolassi, Michael O'Brien and Dolinski, were convicted of those counts charging riot and conspiracy. The eight appellants convicted of all charges were sentenced as follows: on the count charging riot, a fine of one thousand ($1,000) dollars and a term of imprisonment of from one to three years; on the count charging malicious destruction of fences, a fine of fifty ($50) dollars and a concurrent term of three to six months imprisonment; on the count charging conspiracy, a two year probationary period to be served consecutively to the term of imprisonment imposed. The three appellants convicted of riot and conspiracy were sentenced to a term of imprisonment of nine months to two years and fined one thousand ($1,000) dollars on that count charging riot; and on that count charging conspiracy, to a consecutive two year probationary term and a fine of five hundred dollars.

Following denial of appellants' post-verdict motions in the trial court, appeals were taken to the Superior Court. On October 20, 1978, that court affirmed the judgments of sentence. *Commonwealth v. Tolassi*, 258 Pa.Super. 194, 392 A.2d 750 (1978). We granted a petition for allowance of appeal.

Appellants advance nine assertions of error. We address these seriatim.

Initially appellants argue the trial court erred in denying their pretrial motion for severance. In support of this assertion appellants propound, essentially, three rationales. First, appellants claim that the publicity attendant to the instant case characterized the crime as an example of labor union violence, particularly emphasizing the allegedly violent history of Local 30 of the Roofers Union. As all fourteen of the defendants in the instant case were roofers, and thirteen were members of Local 30, appellants contend a strong likelihood of associational guilt existed. Second, appellants assert the Commonwealth's case focused on the activities of groups of persons rather than upon individuals,

and hence the jury was unable to determine whether individual appellants were engaged in criminal activity. Finally, appellants argue that since the Commonwealth's case rested principally upon photographic evidence, to-wit, photographs of the riot taken by a non-involved observer, and since aside from the photographs no witness identified any appellant as having participated in the crimes, the jury was faced with what appellants characterize as the extremely difficult if not impossible task of keeping straight the names and actions of the accused. Appellants rely for support primarily upon our decision in *Commonwealth v. Belgrave,* 445 Pa. 311, 285 A.2d 448 (1971).

The decision whether to sever cases against co-defendants is one within the sound discretion of the trial court. *Commonwealth v. Kloiber,* 378 Pa. 412, 106 A.2d 820 (1954), cert. denied, 348 U.S. 875, 75 S.Ct. 112, 99 L.Ed. 688 (1954); Pa.R.Crim.P. 219. Such a decision will be reversed only where there has been a manifest abuse of that discretion. *Commonwealth v. Lasch,* 464 Pa. 573, 347 A.2d 690 (1975) (opinion in support of affirmance); *Commonwealth v. Patrick,* 416 Pa. 437, 206 A.2d 295, appeal after remand 424 Pa. 380, 227 A.2d 849 (1965). And the critical factor in one analysis is the prejudice which inures to the accused as a result of the trial court's determination. *Commonwealth v. Peterson,* 453 Pa. 187, 194, 307 A.2d 264, 267 (1973); *Commonwealth v. Lasch, supra,* 464 Pa. at 584–585, 347 A.2d 690. From this perspective it can be seen that appellants' reliance upon *Belgrave, supra,* is misplaced.

In *Belgrave,* sixteen individuals were charged with riot and assault, charges which arose out of a melee at a high school football game. In addition, however, to the general riot charges, five of the sixteen were charged with a separate assault upon a band musician, and a sixth was charged with an assault upon spectators. Although, as we said, "there was one riotous scene, the riot [could have been] viewed as the background of two prominent features: the assault on the band member and the assault on the . . . spectators." *Id.,* 445 Pa. at 315, 285 A.2d at 450. "Quite

simply," we held "there [was] a very real possibility that those appellants having no connection with the assaults were nonetheless prejudiced by that evidence." *Id.*, 445 Pa. at 316, 285 A.2d at 450.

■ In the instant case, however, all appellants were charged with identical offenses: riot, malicious destruction of fences and conspiracy. All the offenses so charged arose from the same criminal activity, i. e., the destruction of the cyclone fence which enclosed the construction site. Moreover, unlike *Belgrave, id.*, the evidence in the instant case consisted not of witness identification testimony but rather of photographs depicting the riot in progress, eliminating what we decried in *Belgrave*, viz, "the constant shifting of names presented to the jury [which] might possibly blur the jury's vision." *Id.* Finally, the result in the instant case contravenes appellants' assertion of prejudice. Eight of the accused were convicted of all three charges; three were convicted only of riot and conspiracy; three were acquitted on all counts.

Appellants' claim of prejudice is without merit.

■ Appellants next argue the trial court erred in denying their pre-trial motion for change of venue. It is clear that an application for change of venue is addressed to the sound discretion of the court, and its exercise of that discretion will not be disturbed by an appellate court in the absence of an abuse of discretion. See, e. g. *Commonwealth v. Casper*, 481 Pa. 143, 392 A.2d 287 (1978); *Commonwealth v. Rolison*, 473 Pa. 261, 374 A.2d 509 (1977), *cert. den.* 434 U.S. 871, 98 S.Ct. 215, 54 L.Ed.2d 150 (plurality opinion); *Commonwealth v. Scott*, 469 Pa. 258, 365 A.2d 140 (1976); *Commonwealth v. Powell*, 459 Pa. 253, 328 A.2d 507 (1974).

"On pretrial application for change of venue, we must first determine if potentially prejudicial material was in fact disseminated. In *Commonwealth v. Frazier*, 471 Pa. 121, 369 A.2d 1224 [1977], this court defined three types of inherently prejudicial material:

"1. References to a defendant's prior criminal record. *Commonwealth v. Pierce*, 451 Pa. 190, 303 A.2d 209 (1973).

"2. References to information received from police that a defendant had confessed. *Commonwealth v. Pierce*, supra.

"3. Reports that go beyond objective reporting and become emotional and inflammatory. *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966)." *Rolison, supra*, 473 Pa. at 268, 374 A.2d at 512.

In support of their contention, appellants introduced 149 exhibits which they characterized as constituting prejudicial pre-trial publicity. The trial court found, and the record supports its finding, that none of the exhibits breached the guidelines established in *Pierce, supra*. "Virtually all of the articles," the trial court found, "were written prior to the end of April of 1974." Trial commenced September 9, 1974. Many of the articles were written at the time of the crime, over two years prior to trial. The trial court found no articles not written in a routine, primarily factual style, neither inflammatory nor emotional. Moreover, none of appellants' exhibits referred to them by name or intimated they had participated in the acts of destruction or were guilty of any crime.

On these facts we cannot say the finding of the trial court that there was not such prejudicial pretrial publicity so as to warrant change of venue was error, or that its ruling denying appellants' pretrial application constituted abuse of discretion. See, *Rolison, supra; Casper, supra*.

Appellants' third argument assigns as error the ruling of the trial court refusing to sequester the jury. Once again, the disposition of a motion to sequester the jury is within the discretion of the trial court. Pa.R.Crim.P. 1111(a). And the decision of the court will not be reversed unless the court "abused its discretion or committed an error of law which controlled the outcome of the case." *Commonwealth v. Stoltzfus*, 462 Pa. 43, 52, 337 A.2d 873, 877 (1975).

However, there are, of course, certain circumstances where adverse publicity attendant to the trial is so pervasive, intense and prejudicial that the law will presume the jury's deliberations were affected by it. *Commonwealth v. Bruno*, 466 Pa. 245, 352 A.2d 40 (1976).

■ In highly publicized or sensational cases a number of alternatives are available to the court to preserve the integrity of the factfinding process. In most cases, however, admonitions to the jury such as those which appear in the ABA Projection Minimum Standards for Criminal Justice, Standards Relating to Fair Trial and Free Press § 3.5(e) (Tentative Draft, 1966) will suffice. And in such cases appellate courts will presume the efficacy of cautionary instructions unless actual prejudice is demonstrated. *Stoltzfus, supra*, 462 Pa. at 55, 337 A.2d 873.

■ We note again that in the instant case there was relatively little publicity contemporaneous with the trial. Where such publicity did occur, the trial court promptly acted to ensure it would have no effect. For example, after eleven jurors had been empaneled, a newspaper article dealing generally with union violence was published in a Philadelphia newspaper. The court conducted a voir dire for each juror and dismissed the one juror who had read the article. A second article appeared in a newspaper shortly after trial commenced. In this instance the court declined to voir dire the jury, but rather instructed the jury to avoid discussing the case, or reading, listening to or viewing news accounts of the trial. The court so instructed the jury prior to each recess and at the end of every day's session. Finally, when appellants alleged that a juror had overheard some prejudicial comments concerning the case while on an elevator in the courthouse, the court questioned her and established she had not in fact heard the alleged remarks.

Thus, it may be seen there was little potentially prejudicial publicity attendant the instant trial. The trial court acted diligently to assure the jury was not exposed to such publicity as did exist. Moreover, appellants have pointed to

no actual prejudice resulting from the court's refusal to sequester the jury. In such circumstances we find no abuse of the discretion vested in the court below.

■ Appellants next argue they were denied their constitutional right to speedy trial. It must first be noted that since the criminal complaints in the instant case were filed prior to June 30, 1973, our Pa.R.Crim.P. 1100, the 180-day rule, does not apply. Rather, our analysis must be that outlined in *Commonwealth v. Hamilton*, 449 Pa. 297, 297 A.2d 127 (1972), and by the balancing test outlined in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), which we adopted therein.

■ Appellants were arrested on various dates in September and October, 1972; trial commenced September 9, 1974. Thus, the length of the delay between arrest and trial, the first of the four factors to be balanced under the *Barker v. Wingo* test, was nearly two years. Although not dispositive of the issue, a delay of two years is "enough to trigger an inquiry into the other factors." *Commonwealth v. Hamilton, supra*, 449 Pa. at 300, 297 A.2d at 128.

■ Our inquiry into the other factors reveals that the reason for the delay was twofold: first, the consistent unavailability of one or more of appellants' privately retained defense counsel; and second, the decision of the court to sever the cases of nine additional defendants to be tried separately from the instant appellants. It is, as the Superior Court noted, "paradoxical that appellants claim on the one hand that their cases should have been severed and separately tried, and on the other hand lay much of the blame for the delay in their trial on the fact that nine of the defendants were severed . . . ." *Commonwealth v. Tolassi, supra*, 258 Pa.Super. at 204–205, 392 A.2d at 756. Further, the record does not indicate that appellants ever demanded trial or expressed any concern that they would be prejudiced by delay until July, 1974. At that time the court, having determined the delay was not attributable to the prosecution, and having scheduled trial for September 9, 1974,

denied appellants' motion to dismiss. Finally, appellants can point to no prejudice which inured to them as a result of the delay other than to reiterate that inflammatory pretrial publicity impinged upon their right to receive a fair trial. Owing particularly to the finding of the trial court, affirmed by the Superior Court and also by us, that any potentially adverse pretrial publicity had substantially abated in the hiatus between the crimes and appellants' trial, the irony of appellants' position can be seen. Their chances of receiving a trial unaffected by pretrial publicity improved rather than deteriorated during the delay. "In light of the fact that none of the appellants were incarcerated prior to trial and that failing memories of witnesses were not a factor in this case, no prejudice, either actual or potential, can be inferred." *Tolassi, id.*

Appellants' fifth assignment of error assails the ruling of the trial court refusing to order the Commonwealth to disclose the identity of an eyewitness-informant. The witness at issue was one of sixty-two persons present at the riot whose identities were known to the prosecution; the names of sixty-one were provided to the defense. The identity of the remaining witness, however, was withheld following the witness' expression of fear of retaliation. Although he had been present at the scene of the riot, the witness was unable to identify any participant in criminal activity on that basis. He did, however, identify two of the accused in the photographs of the event.

In *Roviaro v. United States*, 353 U.S. 53, 60–62, 77 S.Ct. 623, 628, 1 L.Ed.2d 639 (1957), the Supreme Court established the now well-settled test for determining whether the prosecution must forego the privilege of protecting the identity of an informant.

"Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way. In these situations the trial court may require disclosure and,

if the Government withholds the information, dismiss the action.

\* \* \* \* \* \*

"We believe that no fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors."

Under the facts of the instant case we are at a loss to ascertain what prejudice to appellants resulted from the ruling of the trial court. The most nearly exculpatory testimony the witness could have provided was that he could not say any of the accused had participated in criminal conduct. Considering that there were nearly one thousand persons present at the construction site, hundreds of whom rioted, such an observation would have been of extremely limited probative value, a fact emphasized by the failure of the defense to call any of the sixty-one witnesses whose names were provided by the prosecution. We perceive no error in the ruling of the trial court. See, *Commonwealth v. Garvin*, 448 Pa. 258, 293 A.2d 33 (1973); *Commonwealth v. Carter*, 427 Pa. 53, 233 A.2d 284 (1967).

Sixth, appellants assert the trial court committed reversible error in permitting the prosecutor to comment upon the photographs of the riot by suggesting to the jury similarities in appearance between persons appearing in the photographs and the various defendants. Appellants alternatively assail the conduct of the prosecutor as either identification testimony, or as expression of personal opinion on issues properly within the purview of the jury.

Appellants complain, for example, of the following in the prosecution's summation:

"Now, members of the jury, let's take one at a time. The first man, Detective Cannon testified that he got an arrest warrant for an individual by the name of Richard McLain. He pointed out this man right on the front as Richard McLain." "All right, I suggest to you, members of the jury, and I'm pointing my pen at this individual, we're talking, I said, about Richard McLain, and I'm pointing my pen at a certain individual who is on Ct–12–A. "I'm pointing my pen at the man in the stripes—vertical striped pants in the light shirt . . . and the tattoo on his arm."

\* \* \* \* \* \*

"Now, I am showing the jury Ct–41 and again I am pointing my pen, talking to you, I suggest about the same individual. This photograph shows him full face, I suggest to you."

\* \* \* \* \* \*

"And I suggest to you, members of the jury, that when you look at those pictures, look at this individual . . . everything about him, the tattoos, the hair style, the stature, the size, that you should conclude beyond a reasonable doubt that is Richard McLain."

"Now, what's he doing in that picture? I suggest to you that what he is doing is preparing to jump on that fence. Is there any doubt about it?"

 It is true the prosecutor's summation was unorthodox, but more than unorthodoxy must be shown. Not in the argument above quoted, nor, our review of the record persuades us, in the remainder of the closing argument, did the prosecutor exceed the bounds of permissible argument. Compare, *Commonwealth v. Russell*, 456 Pa. 559, 322 A.2d 127 (1974); *Commonwealth v. Lipscomb*, 455 Pa. 525, 317 A.2d 205 (1974).

[16, 17] In a seventh and related claim appellants contend the trial court's instructions to the jury had the "general effect" of conveying to the jurors the impression that the court agreed with the district attorney that the accused

were depicted in the photographs. It is by now axiomatic that we read and review the court's charge to the jury in its entirety. *Commonwealth v. Stoltzfus, supra.* Our review of the trial court's charge convinces us that it accurately and fairly recapitulated the law. In particular three of the defense's requested points for charge cautioning the jury concerning "identification by build" were affirmed and read to the jury. Appellants' argument is without merit.

Appellants' eighth assignment of error challenges the propriety of the court's permitting the jury, after it had retired to deliberate, to reenter the courtroom to receive further instructions, and to view certain of the defendants in comparison with photographs the jurors had taken out with them.

 It is, of course, well-settled that a trial court may, in its discretion, give further instructions to a jury which requests them. *Commonwealth v. Boone,* 467 Pa. 168, 354 A.2d 898 (1976); *Commonwealth v. McNeil,* 461 Pa. 709, 337 A.2d 840 (1975). Instantly the instructions requested were proper and we perceive no error in granting the request.

Of more moment is the second point raised in appellants' claim. In addition to requesting further instructions, the jury also "request[ed] permission to bring back with us into the Court room the following exhibits for a comparative study T–7, T–29, T–67, T–68. [photographs]" "Also we need a closer look at each defendant." The jury was brought back into the courtroom where the following occurred.

"MR. SIMONE: For the record, please note my objection to Your Honor's last statement about the jury being given an opportunity to get a closer look at the defendants.
"THE COURT: Yes.
"MR. SIMONE: The defendants are all present in the courtroom.
"THE COURT: Yes. In order to complete the record, the Court has noted that each of the defendants, immediately upon entering the courtroom, sat down and turned to the

right so that the rear of each defendant was facing the jury and some of the defendants then covered their faces with their hands in an obvious attempt to make it impossible for the jury to see the defendant. And, accordingly, the Court is going to authorize the admittedly unusual procedure which I just described to the jury.

"Now, would you like to take a look? All right, will the tipstaffs please just escort the jury up and down the front of the defendants.

"There will be no discussion or comment among the jurors or between the jurors during this time. Okay."

Appellants direct us to no authorities which hold or suggest that granting the concededly unusual request by the jury was error. Our research reveals no cases disposing of the issue, but it is clear that the trial court is vested with the discretion to help resolve confusion or misapprehension of the facts in the minds of the jurors. *Commonwealth v. Fontaine*, 183 Pa.Super. 45, 128 A.2d 131 (1956). "This discretion is an incident to the mode and manner of trial and, in the absence of flagrant abuse, should rest with the trial court." *Id.,* 183 Pa.Super. at 47, 128 A.2d at 132. We perceive no such flagrant abuse instantly.

Finally, appellants argue the verdict was the product of an overworked and fatigued jury. This issue was not included in written post-verdict motions and is, hence, waived. *Commonwealth v. Blair*, 460 Pa. 31, 331 A.2d 213 (1975).

Judgments of sentence affirmed.

NIX, J., took no part in the consideration or decision of this case.

ROBERTS, J., files a dissenting opinion which LARSEN, J., joins.

ROBERTS, Justice, dissenting.

I cannot agree that a prosecuting attorney may offer at closing argument testimony which no witness was permitted

to present. Crucial to the Commonwealth's case were a series of photographs taken during the incidents that gave rise to this prosecution. Conviction clearly depended on the jury's conclusion that some of the men depicted in the photographs were the defendants. I cannot conclude that the prosecutor's comments concerning the photographs were permissible.

Although the photographs were admitted into evidence, the trial court carefully refused to allow testimony that those in the photographs were the defendants. This, the court noted, was for the jury. See Record at 1415a–53a. Moreover, the photographs were not shown to the jury during the prosecution's case. It was only during the prosecutor's closing argument that the jury was shown the photographs. And the record is clear that during this argument the prosecutor was permitted to offer the equivalent of his own identification testimony concerning the photographs, testimony which no other witness had given. For example, having displayed a photograph to the jury, the prosecutor remarked:

"Now, I think you have firmly in mind the photograph. We're talking about this individual, this individual, this picture you just saw, this individual, which appears to be an enlargement taken by Sergeant Thomas. And I suggest to you, members of the jury, that when you look at those pictures and look at this individual, the distinctive clothing, I suggest everything about him, the tattoos, the hair style, the stature, the size, that you should conclude beyond a reasonable doubt that is Richard McLain."

Appendix to Brief for Appellants at 28. In the circumstances, such comments were obviously improper and prejudicial.

The prosecutor's summation here was plainly not, as the majority would have it, an "unorthodox" review of the evidence, nor was it merely a suggestion to the jury of what they might believe the photographs showed. Rather the prosecutor's obvious aim was to place his own identification testimony into evidence. This the prosecutor may not do.

60

Orthodox or unorthodox, it was impermissible and inflammatory and appellants are entitled to a new trial.

LARSEN, J., joins this dissenting opinion.