439 A.2d 720

COMMONWEALTH of Pennsylvania,

v.

David ANDERSON, Appellant.

COMMONWEALTH of Pennsylvania,

v.

Richard ROSS, Appellant.

COMMONWEALTH of Pennsylvania,

v.

Melvin JOHNSTON, Appellant.

COMMONWEALTH of Pennsylvania,

v.

Tyrone BRYANT, Appellant.

Superior Court of Pennsylvania.

Submitted Nov. 14, 1980.

Filed Dec. 18, 1981.

2

Wayne S. Lipecky, Steven Kocherzat, John P. Dohanich and Joseph M. Budicak, Assistant Public Defenders, Beaver, for appellants.

John L. Brown, Assistant District Attorney, Beaver, for Commonwealth, appellee.

Before SPAETH, JOHNSON and POPOVICH, JJ.

JOHNSON, Judge:

This is an appeal from the order of October 12, 1979, which denied Appellants' motions to quash on grounds of double jeopardy.

On August 13, 1979, Appellants were tried jointly with Valentine and another inmate of the Beaver County Jail on charges of Involuntary Deviate Sexual Intercourse,[1] Indecent Assault,[2] and Assault by a Prisoner.[3] The charges against Valentine were nolle prossed, and the other defendants were granted a motion for a mistrial.

1. 18 Pa.C.S.A. § 3123.

2. *Id.,* § 3126.

3. *Id.,* § 2703.

4

Appellants' retrial commenced on September 10, 1979, before a jury. At the conclusion of the first day of trial, the judge denied a request for instructions to caution the jury against reading or listening to news reports about the trial. Articles appeared in the *Beaver County Times* on September 10 and in the local edition of the *Pittsburgh Post-Gazette* the next morning.

These articles referred to the trial and to the motives of Valentine, who, in an in camera proceeding, from which the press had been specifically excluded, had refused to testify despite a grant of immunity. The *Post-Gazette* article contained the following information:

> Joseph Stanichak, assistant district attorney, based his belief that Valentine would implicate the other inmates on a statement Valentine wrote while under oath.
>
> \*     \*     \*     \*     \*     \*
>
> Stanichak said during a recess that Valentine faces substantial jail time for other offenses with which he is charged, including participation in the June breakout. "He figures, 'Why not save my buddies because how much more time can I get?'" the prosecuting attorney said.

At the beginning of the second day of trial, defense counsel notified the court about the articles. When the jurors were polled concerning whether or not they had read the article in the *Post-Gazette*, all of the jurors responded affirmatively. Appellants Bryant and Ross were granted a motion for a mistrial. The judge then proceeded sua sponte to declare a mistrial for Anderson, Johnston, and the one additional defendant, despite the objections of their respective counsel.

Appellants presented motions to quash, contending that retrial would constitute double jeopardy. Appellants then filed this appeal from the denial of their motions. For the following reasons, we reverse.

The appeals of Bryant, Ross, Anderson, and Johnston have been consolidated in this appeal. In the case of Appellants

Anderson and Johnston, the issue is whether or not "manifest necessity" existed for the trial judge to declare a mistrial over the objections of the forenamed Appellants. The issue in the case of Appellants Bryant and Ross is whether or not the prosecutor's conduct constituted prosecutorial overreaching, so that a retrial would be barred under the Double Jeopardy Clause.

In deciding the first issue, we must determine whether or not the judge's sua sponte declaration of a mistrial was dictated by "manifest necessity." *See Commonwealth v. Stewart*, 456 Pa. 447, 451, 317 A.2d 616, 618 (1974). The Pennsylvania courts have not adopted a clear-cut definition of "manifest necessity"; instead, they have determined the existence or nonexistence of "manifest necessity" by reviewing the particular circumstances of each case. *Commonwealth v. Bycer*, 254 Pa.Super.Ct. 336, 340, 385 A.2d 1367, 1369 (1978). If the appellate court, after considering the factual details of the case, determines that the trial judge did not abuse his discretion in deciding that manifest necessity compelled the declaration of a mistrial, a retrial will not violate the Double Jeopardy Clause. *Commonwealth v. Stewart*, 456 Pa. at 451, 317 A.2d at 619.

In the instant case, the trial judge learned, in the morning of the second day of trial, of the circulation of the articles described above. When the judge polled the members of the jury, he discovered that every juror had read the article in the *Post-Gazette.*

The content of this article would prejudice the jurors' views so they would be unable to make a decision that would be based solely on the evidence presented in court. *See Commonwealth v. Pierce*, 451 Pa. 190, 194, 303 A.2d 209, 212 (1973). By reference to the statements of Joseph Stanichak, Assistant District Attorney, the articles created a substantial risk that the jurors would have great confidence in the content of the articles due to the position that such a person holds in the community. *Id.*, 451 Pa. at 198, 303 A.2d at 214. Also, the reference to Valentine's written statement *under oath* creates an aura of validity about this statement since it

is assumed that one is more likely to be truthful if he speaks under oath.

Also, the time of publication of the articles in the instant case is another factor that contributed to the manifest necessity of declaring a mistrial. Since the articles were published while the trial was in progress, there was no "cooling off period" to lessen the effect of the articles upon the jurors. *See Commonwealth v. Cohen*, 489 Pa. 167, 178, 413 A.2d 1066, 1076 (1980).

When the total effect of the foregoing circumstances is considered, it is clear that manifest necessity to declare a mistrial existed in the instant case. It would be nearly impossible for the jurors, all of whom had read one of the articles, to divorce what they had read from the evidence that was presented in the courtroom. The jurors must base their decision solely upon the evidence and arguments that they hear in the courtroom,[4] but a decision that was untainted by the newspaper articles could not be reached in the instant case. Thus manifest necessity to declare a mistrial existed.

█ A finding that manifest necessity existed as a basis for the trial court's sua sponte declaration of a mistrial generally does not bar a retrial under the Double Jeopardy Clause. *Commonwealth v. Stewart*, 456 Pa. at 451, 317 A.2d at 621; *Commonwealth v. Bycer*, 254 Pa.Super.Ct. at 341, 385 A.2d at 1368–1369. Previous cases, however, have not addressed the situation in which circumstances that created manifest necessity were caused by alleged prosecutorial misconduct.

In the instant case, Appellants Bryant and Ross contend that the prosecution's conduct bars their retrial on double jeopardy grounds. We proceed to determine whether or not

4. *See Commonwealth v. Pierce*, 451 Pa. at 194, 303 A.2d at 212, which cites Mr. Justice Holmes' statement in *Patterson v. Colorado*, 205 U.S. 454, 462, 27 S.Ct. 556, 558, 51 L.Ed. 879 (1907):

The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print.

a retrial for either Appellants Anderson and Johnston or Appellants Bryant and Ross is barred because of prosecutorial overreaching.

In *Commonwealth v. Starks*, 490 Pa. 336, 416 A.2d 498 (1980), the court defined two types of prosecutorial overreaching, both of which create exceptions to the general rule that the Double Jeopardy Clause does not bar retrial of a defendant whose motion for a mistrial has been granted. *Lee v. United States*, 432 U.S. 23, 30, 97 S.Ct. 2141, 2145, 53 L.Ed.2d 80 (1977); *United States v. Dinitz*, 424 U.S. 600, 607, 96 S.Ct. 1075, 1079, 47 L.Ed.2d 267 (1976). The first type of prosecutorial misconduct is designed to provoke a mistrial. *United States v. Dinitz*, 424 U.S. at 611, 96 S.Ct. at 1081. The second type is undertaken in bad faith to prejudice or harass the defendant. *Lee v. United States*, 432 U.S. at 33, 34, 97 S.Ct. at 2147, 2148; *Commonwealth v. Starks*, 490 Pa. at 341, 416 A.2d at 500. *See also, Commonwealth v. Hoskins*, 494 Pa. 600, 432 A.2d 149 (1981).

Although Appellants do not contend that the prosecutor's conduct was designed to provoke a mistrial, the prosecutor's misconduct must be examined to determine whether or not the prosecutor acted in bad faith to prejudice or harass Appellants.

In the foregoing discussion of the existence of manifest necessity to declare a mistrial, the existence of actual prejudice to Appellants was obvious. We must proceed to consider whether or not the prosecutor's conduct, which resulted in this prejudice, was "undertaken in bad faith to prejudice . . . the defendant(s)." *Commonwealth v. Starks*, 490 Pa. at 341, 416 A.2d at 500.

In *Commonwealth v. Clark*, 287 Pa.Super.Ct. 380, 430 A.2d 655 (1981), we held that the following guidelines are relevant to determine whether or not the prosecutor acted in bad faith:

(1) the absence of any actions undertaken by the prosecutor to preserve the trial and to enhance the defendant's prospects for a fair trial after the misconduct occurred, (2) the absence of either abundant or convincing evidence of

the defendant's guilt, so that the prosecutor's misconduct might reasonably be perceived as an attempt to rescue an inadequate prosecution, (3) the absence of misconduct causing serious and incurable prejudice to the defendant, (4) the absence of any neutral explanations, including inexperience, trial strategy, or inadvertence on the part of the government, to show that it did not, in fact, act purposely, (5) observations of the trial judge concerning the prosecutor's motives, and (6) defiance by the prosecutor of any direct order or clear admonition by the trial court to refrain from specific conduct prejudicing the defendant's prospects for acquittal.

*Id.*, 287 Pa.Super. at 392, 430 A.2d at 661.

In regard to the first guideline, the record in the instant case reveals an absence of any actions by the prosecution to preserve the trial and to enhance the defendants' prospects for a fair trial. Near the beginning of the discussions with the judge concerning the newspaper articles, the prosecutor argued that no prejudice had occurred because the content of the articles had been known by various people. Later, when the court agreed to poll the jury, the prosecutor moved for a mistrial on three grounds:

Number one, on the untimely application made to the Court regarding the testimony of one, Robin Kerr, [a defense witness]; improper application and statements made yesterday making reference to the fact that there was a trial last month and, three, in light of the fact that this could possibly prejudice the case against the Commonwealth, as that article appears in the paper, we move for a mistrial on behalf of the Commonwealth.

At no time did the prosecutor request the court to issue any curative instructions that might have "saved" the trial.

In applying the second guideline of *Clark* to the instant case, the prosecutor's divulgence of information to the press may be interpreted as "an attempt to rescue an inadequate prosecution." 287 Pa.Super.Ct. at 393, 430 A.2d at 661. The victim, who was the chief prosecution witness, could only identify two of the defendants. Valentine, a potential pros-

ecution witness, had refused to testify. A physician's testimony, establishing that the victim's laceration could have been caused by the insertion of a blunt object into his anus, constituted the remainder of the prosecution's case. Obviously, the prosecution's case suffered from an "absence of either abundant or convincing evidence of the defendant[s'] guilt." *Id.*, 287 Pa.Super. at 393–394, 430 A.2d at 661.

The third *Clark* guideline is whether or not the prosecutor engaged in misconduct that caused "serious and incurable prejudice to the defendant." In our foregoing discussion of manifest necessity, it was clearly established that the prosecutor's statements to the press resulted in "serious and incurable prejudice" to Appellants. In fact, the prejudice was so serious that manifest necessity existed to declare a mistrial.

The fourth guideline, which is proposed by *Clark*, is whether or not the prosecutor can present any explanations, such as trial strategy, inexperience, or inadvertence, to show that he did not act purposefully. *Id.*, 287 Pa.Super. at 394, 430 A.2d at 661. An examination of the facts in the instant case reveals that the prosecutor not only violated the clearly-defined purpose of the in camera proceeding but also had previously experienced breaches of promises by the press.

The prosecutor's statements to the press concerned an in camera proceeding from which the media had been specifically excluded. The following explanation for the proceeding was provided by the judge during the trial:

THE COURT: Well, the purpose of the In Camera hearing was so that there would be no publicity to the matter that was raised in connection with the expected and anticipated testimony of Charles Valentine. And the Court thought it was perfectly proper that hearing should be In Camera, and it was. And the press honored that statement when I made it from the Bench that it would be an In Camera hearing.

In light of the foregoing explanation, even if the prosecutor did not anticipate that his information would be printed,

the prosecutor's failure to exercise sufficient caution in dealing with the reporters constituted a failure to abide by a clearly-defined obligation. The judge conducted an in camera hearing to avoid publicity, yet the prosecutor deliberately risked the divulgence of his statements by the press. Not only had the court cautioned everyone connected with the case that this matter was not to be publicized, but also the Code of Professional Responsibility defines the prosecutor's duty after commencement of trial. Section D of DR 7–107 states:

> During the selection of a jury or the trial of a criminal matter, a lawyer or law firm associated with the prosecution or defense of a criminal matter shall not make or participate in making an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication and that relates to the trial, parties, or issues in the trial or other matters that are reasonably likely to interfere with a fair trial, except that he may quote from or refer without comment to public records of the court in the case.

In light of the foregoing discussion, the prosecutor's statements to the press certainly were not inadvertent. Although the prosecutor testified that he made the statements as "background information" for the press, his previous experiences should have alerted him to the probability that his statements would be divulged. At the hearing on the newspaper articles, the prosecutor testified:

> [I]t has been my philosophy that lawyers should not publicize or engage in any type of conversation or activities with media people because they have always completely distorted and smeared names and stories all over the place, and I have been the victim of this over a period of time. If anybody should not speak, I have to plead to this Court that I should not.

Despite his past experiences, the prosecutor felt sorry for the newspaper woman and newspaper man, who had been excluded from the in camera proceeding:

I just couldn't walk away from her [the newspaper woman]. Mr. Atzinger [the newspaper man] was there. I immediately cautioned them that I felt sorry that they couldn't be in the courtroom, that those were the rules, but I would tell them what happened and under no circumstances were they to use this in any type of a newspaper article *and attach my name to it.* This was simply for their background information that they would be able to use at the conclusion of the case. Then I went on further to explain what happened. [Emphasis added.]

Due to his previous unpleasant experiences with the press, the prosecutor should have been forewarned not to divulge information about the in camera proceeding. Thus, the prosecutor cannot assert inadvertence, inexperience, or any other "neutral explanation," under the fourth guideline in *Clark*, to justify his conduct.

As our discussion of the fifth *Clark* guideline, we adopt the analysis of Judge Popovich in his Concurring Opinion on page 725, infra.

The final guideline in *Clark* is the prosecutor's defiance of the court's order or admonition to refrain from specific conduct that would prejudice the defendant. Although, in the instant case, the court did not order or admonish the prosecutor personally to refrain from specific conduct, it is relevant that the court clearly stated that it did not want any publicity concerning the in camera proceeding. As discussed in the foregoing analysis of the fourth guideline, the prosecutor acted intentionally to divulge the information to the press, despite the judge's admonition.

As the foregoing discussion of the *Clark* guidelines indicates, the prosecutor in the instant case acted in bad faith. The result of his acting in bad faith was highly prejudicial to Appellants. Not only was the result of the prosecutor's misconduct highly prejudicial to Appellants, but also the prosecutor's intention appears to have been to prejudice Appellants—particularly Bryant and Ross. The article, quoted on page 721, supra, indicates that Valentine's statement would implicate "the other inmates." This phrase

intimates that all five defendants were implicated. · In fact, Bryant and Ross were not implicated at all. The alleged implication of Bryant and Ross was not due to a mistake of the reporters. The prosecutor admitted that he had indicated to the *Post-Gazette* reporter that Valentine's statement implicated all of the five defendants. Such conduct surely indicates an intent to prejudice Appellants.

In view of the aforesaid circumstances—the prosecutor's clear duty under DR 7–107, his previous experiences with the news media, his communication that had a high potential for dissemination by the press, the highly prejudicial information in the instant case, the specific exclusion of the press from the in camera proceeding, and the prosecutor's deliberate misinformation that prejudiced Appellants—we hold that the prosecutor acted in bad faith to prejudice Appellants.

Although the court granted the motion for a mistrial by Appellants Bryant and Ross, the prosecutor's bad faith conduct bars a retrial. *Commonwealth v. Starks*, 490 Pa. at 341, 416 A.2d at 500. In the cases of Appellants Anderson and Johnston, where a mistrial was declared sua sponte, the prosecutor's bad faith conduct caused the manifest necessity. Thus, the prosecutor's misconduct bars a retrial, for the reasons set forth hereinabove, despite the existence of manifest necessity.

The order of October 12, 1979, is reversed, and Appellants are ordered discharged.

POPOVICH, J., files a concurring opinion.

SPAETH, J., concurs in the result.

POPOVICH, Judge, concurring:

While I believe the prosecution's misconduct bars retrial, this writer takes the opportunity to comment on the factual setting of the case for the purpose of giving courts of this Commonwealth some guidance in cases where prosecutorial

misconduct has been alleged.[1]  This is consistent with the dictates of the United States Supreme Court as well as our own high Court that " 'appellate tribunals have the *duty* to make an independent evaluation of the circumstances[ ]" attendant to claims of prosecutorial misconduct (i.e., over-reaching or bad faith).  *Commonwealth v. Cohen,* 489 Pa. 167, 179, 413 A.2d 1066, 1073 (1980)  (quoting *Shepphard v. Maxwell,* 384 U.S. 333, 362, 86 S.Ct. 1507, 1522, 16 L.Ed.2d 600 (1966).  Cf. *Commonwealth v. Tolassi,* 489 Pa. 41, 51–53, 413 A.2d 1003, 1008 (1980)  (although findings of the trial court were not in error appellate court conducted its own independent evaluation of the facts).

It is a rare instance, indeed, in which a prosecutor openly admits to intentionally aborting the trial with the injection therein of highly prejudicial information consonant with prosecutorial misconduct.  Therefore, close attention must be paid to the factual setting surrounding the complained of conduct.  This case provides this Court with such an opportunity.

1.  The unique procedural posture of this case also deserves comment. The trial court was faced with a mistrial motion made on behalf of two of the defendants and an objection to the granting of that motion by three of the defendants.  The prosecution, in chambers, moved for a mistrial as to all of the defendants.  The court granted the defendant's mistrial motion and *sua sponte* declared a mistrial as to the three objecting defendants.  This situation is unique because "a motion by the defendant for mistrial is ordinarily *assumed to remove* any barrier to reprosecution, *even if the defendant's motion is necessitated by prosecutorial or judicial error."  Commonwealth v. Meekins,* 266 Pa.Super. 157, 162–164, 403 A.2d 591, 594 (1979)  (quoting *United States v. Jorn,* 400 U.S. 470, 483, 91 S.Ct. 547, 557, 27 L.Ed.2d 543, 556–57 (1971)  (emphasis added)  (citations omitted).  On the other hand, "[w]here a mistrial is declared in the face of an accused's desire to continue the trial, *reprosecution may be precluded, even though had the case proceeded to verdict and been reversed on appeal, no barrier to retrial would exist."  Commonwealth v. Myers,* 422 Pa. 180, 192–93, 220 A.2d 859, 866 (1966)  (emphasis added).

A trial court, however, need not be hamstrung when a mistrial motion has been objected to by some but not all of the defendants, because it has the power to declare a mistrial for reasons of manifest necessity when an event at trial is "prejudicial to the defendant and he elects not to move for a mistrial."  *Commonwealth v. Africa,* 281 Pa.Super. 419, 428 n. 14, 422 A.2d 539, 544 n. 14 (1980)  (emphasis added).  In the instant case, the trial court correctly handled the mistrial motion and the objections.

The guidelines adopted by the majority, as originally set forth in *Commonwealth v. Clark*, 287 Pa.Super. 380, 394, 430 A.2d 655, 663 (1981), with one exception, are relevant to indicate the presence or absence of bad faith on the part of the prosecution.[2] Notwithstanding the fact that the list is not exhaustive, these guidelines, when applied to the facts before us, support a finding of bad faith intent.

First of all, the prosecution's case was neither abundant nor convincing as the key prosecution witness, the victim, could only testify having seen two of the five defendants immediately before the incident occurred. But see *Commonwealth v. Washington*, 492 Pa. 572, 424 A.2d 1340 (1981); *Commonwealth v. Potter*, 478 Pa. 251, 386 A.2d 918 (1978) (Opinion in Support of Affirmance); *Commonwealth v. Wright*, 439 Pa. 198, 266 A.2d 651 (1970); *Commonwealth v. Myers*, supra; *Commonwealth v. Simms*, 284 Pa.Super. 528, 426 A.2d 620 (1981); *Commonwealth v. Rios*, 246 Pa.Super. 479, 371 A.2d 937 (1977). According to the victim's uncorroborated testimony, defendants Ross and Johnston approached him one evening while watching television in the trustees' room.[3] (N.T. 40) They asked him to go into the

2. This writer adopts the view set forth by Judge Hoffman in a dissenting opinion and rejects one of the guidelines formulated by the majority in this case and in *Commonwealth v. Clark*, 287 Pa.Super. 380, 392, 430 A.2d 655, 661 (1981). In *Clark*, the majority concluded that a court should consider as relevant "the absence of any actions undertaken by the prosecutor to preserve the trial and to enhance the defendant's prospects for a fair trial *after* the misconduct occurred". *Id.* (Emphasis added.) As the minority opinion appropriately states, this writer considers "a prosecutor's urging that a mistrial not be granted *after* he has engaged in misconduct [to be] totally irrelevant in determining whether he intended to provoke a mistrial or engaged in a bad faith effort to prejudice the defendant. Moreover, reliance on such a factor may encourage prosecutors whose deliberate misconduct provokes a motion for a mistrial to attempt to prevent a successful double jeopardy claim by vigorously arguing that a mistrial should not be granted." *Commonwealth v. Clark*, 287 Pa.Super. at 399, 430 A.2d at 664 (Emphasis in original).

3. The trustees' room was a room downstairs in the Beaver County Jail where all the trustees slept. (N.T. 30, 38) According to the victim, the trustees were inmates who were rewarded for their good behavior and whose responsibilities entailed "sweep[ing] the range, and tak[ing] the meals to the other inmates." (N.T. 31) The chapel

next room, which was the chapel room. (N.T. 41) When the victim refused, he was led by the arm into the room and forced to perform a sexual act on Johnston. (N.T. 40, 45) Defendant Ross repeated Johnston's demands, and the victim once again was forced to perform a sexual act. (N.T. 45)

Moments later, defendants, Turner, Anderson, and Bryant in turn entered the room.[4] (N.T. 48, 51) Turner then approached the victim, and the sexual activity continued. Bryant followed. After Bryant was finished, defendant Anderson told the victim "to get up and pull [his] pants down and lean over the ping-pong table". (N.T. 52–53) When his pants were down, "Anderson was behind . . . [and] stuck a broomstick . . . in [the victim's] rectum." (N.T. 54) The victim then was forced onto a cot from behind and his clothes removed. (N.T. 57) The scenario continued with "[a]ll five of the inmates" penetrating the victim, "after one got off, the other got on, they just told each other to get on, and they kept taking turns." (N.T. 60) The inmates all left the room, which was approximately two hours after the victim's initial entry into the room. (N.T. 60)

At no time during the entire episode could the victim see who was forcing him to engage in sexual activity because the room was dark. The sole source of light in the chapel room came from the reflection of a television in an adjoining room. This light was visible from the opening and closing of the connecting door. Because he would have been able to see from the television light if the door had been opened, the victim only could say positively that nobody left the room once they had entered except when the cot was brought in.

room was located next door to the trustees' room and had a door which was barred by cardboard. (N.T. 41) The chapel room contained a ping-pong table and a weight set. The laundry room also was in the basement and led to the trustees' room. (N.T. 39).

4. For whatever reason, this consolidated appeal does not include defendant Turner. However, the victim's testimony on Turner's participation in the criminal episode is nonetheless relevant to the prosecutorial misconduct issue.

The remainder of the prosecution's case consisted of a physician's testimony concerning an examination the victim had the day after the incident. His testimony established that the laceration observed on the victim could have been caused with a reasonable degree of medical certainty by the insertion of an object into the anus.[5]  (N.T. 112)

No one else testified on behalf of the prosecution because the prosecution's attempt to strengthen its case was undermined by Charles Valentine, a potential witness, who persistently refused to testify. Thus, things were going badly at trial for the prosecution. But see *Commonwealth v. Simms*, supra; *Commonwealth v. Thomas*, 270 Pa.Super. 375, 411 A.2d 767 (1979).

This was the second trial; the first trial had ended in a mistrial due to the prosecution's attempt to call Valentine as a surprise witness. After the testimony of the physician was presented during the second trial, and the prosecution was about to close its case, the court excused the jury and said the following in open court:

"The reason I am staying, the reason the lawyers are staying, the second matter that was mentioned at the time we were at Sidebar, suggested by counsel and agreed on by the Court, relates to all the rest of you who are here in the Court Room. The matter that will be preliminarily considered is going to be an In Camera hearing relative to the *possible* next witness of the prosecution. *For that reason, no one other than the counsel, the defendants, the prosecution, the prosecutor's assistant, and the Stenographer and myself will be in the Court Room.* I mention this because I know that there is always a concern with whether or not there should be a public hearing, a public trial. There will be a public hearing and public trial, but certain matters must be considered preliminary and properly are considered out of the presence of the public. *If*

---

5. There is also testimony in the record which was introduced as part of the defense establishing that the victim did not identify the voices of defendants Anderson and Turner when blindfolded at a voice identification proceeding. (N.T. 192, 198)  The victim, however, did identify defendants Bryant, Ross, and Johnston.  (N.T. 198, 201)

*the matter is presented to the jury, the public is involved, because the jury will then consider it and the public will be able to hear it.* But the matter that we will discuss beginning at 1:15 is going to an In Camera hearing relative to the next possible witness's testimony. We will recess until 1:15, when I want to see counsel." (N.T. 119–120) (Emphasis added)

An in camera hearing followed. The court determined at the hearing that Valentine would not be able to invoke the Fifth Amendment and ordered Valentine to testify because he would be immune from prosecution. A recess was held so that Valentine could consult with his attorney. When the proceedings resumed, Valentine testified as follows:

[Prosecution]

Q Did you understand the nature and extent of the Immunity Order that Judge Mannix issued?

[Valentine]

A Yes, I did.

Q Did you discuss the matter with your attorney, Mr. Rabik?

A Yes.

Q Did Mr. Rabik explain to you the ramifications of the failure to comply with an Immunity Order issued by Judge Mannix?

A Yes.

Q Did you understand what Mr. Rabik said to you regarding the implications if you do not comply with or obey the ruling that Judge Mannix made requiring you to testify?

A Yes.

Q Did you understand that you would not be in any way tried for any matters that occurred on March 19, 1979, at the Beaver County Jail?

A Yes.

Q Understanding all of that, did you make a decision as to whether or not you would honor the ruling that Judge Mannix has made in this case?

18

A  Yes, I have.

Q  What is that?

A  *Refuse to testify.*

Q  And you are going to refuse, continue to refuse to testify, is that correct?

A  *Yes.*

Q  Knowing full well that there will be another proceeding based upon your failure and your refusal, your willful refusal to honor the ruling of Judge Mannix?

A  *Yes.*

Q  THE COURT: Are you finished?

[The Prosecutor]

MR. STANICHAK: Yes, your Honor.

THE COURT: Mr. Rabik is there anything you want to ask or state?

[Valentine's attorney]

MR. RABIK: I have no questions, Your Honor.

THE COURT: Mr. Valentine, you understand my having simply issued an order directing you to testify, but if you fail to comply with that immunity order you are going to be returned to jail and you are going to be subsequently brought back before me for sentencing for contempt of my order? Do you understand that.

MR. VALENTINE: Yes.

THE COURT: And you realize you are in direct violation of my order, in what we call contempt of Court?

MR. VALENTINE: *Yes.*

THE COURT: You realize that?

MR. VALENTINE: *Yes, I do.*

THE COURT: All right. I am directing the Sheriff's Department to take you back to jail, confine him there. We will subsequently consider the matter of the contempt of this Court's order, and that will be done at a later time after this proceeding is over. You will be returned to the jail. You will be later brought before the Court and I will decide at that time what I shall sentence you to for contempt of this order.

MR. VALENTINE: Yes.

(WHEREUPON, the witness was excused.) (N.T. 152–55) (emphasis added).

Before the in camera proceeding was adjourned, the prosecution made one last motion:

"Your Honor, before we conclude, there is one matter I want to move, since the witness, Charles Valentine, has indicated that he refuses to honor the Order of the Court, that he has thumbed his nose at the Order of Court, and the law, as we understand it, and since he has been recommited back to the Beaver County Jail, *we, at this time, move Your Honor that he is a witness who is unavailable. And we have his sworn statement, and we are going to move that it be introduced into evidence and be read to the Jury before the Commonwealth rests.*" (N.T. 155–56) (Emphasis added)

Defense counsels for all the defendants objected to the prosecution's motion because Valentine's sworn statement was not subject to cross-examination. (N.T. 157) Before ruling on the motion, the court ordered a recess and said it was "inclined to think their, [defense counsels'], objection is well taken." (N.T. 157) It was during this recess that the prosecution conversed with the reporters concerning Valentine's sworn statement and his refusal to testify.[6] When the proceedings resumed, the court denied the motion, and the prosecution rested its case. Clearly, this sequence of events

---

**6.** A news reporter for the Post-Gazette testified to this fact at the hearing on the pretrial motion to quash the information:

[Defense Counsel for defendant Turner]:

Q Can you tell the Court when he [the prosecutor] gave that information?

[Reporter for the Post-Gazette]:

A It was in a recess.

Q Was that a recess?

A Valentine had just refused to testify and was being sent back to the jail, and during the period when he was being sent back to the jail, there was a short recess. 10/11/79, p. 6. Another reporter for the Beaver County Times also corroborated Barbara White's testimony. 10/11/79, p. 28.

Hereinafter, all references to the pretrial hearing will be designated 10/11/79, p. ——.

shows that the trial was proceeding in a manner unfavorable to the prosecution. But see *Commonwealth v. Simms,* supra, 284 Pa.Super. at 535–36, 426 A.2d at 623, (1981) (a mistrial was declared two hours after the trial commenced, which was *"long before* the prosecutor could have had in his mind the thought of provoking a mistrial because of things not going his way.") (Emphasis added). Valentine's refusal to testify and the court's denial of the prosecution's motion to admit his statement substantially undermined its chances of obtaining convictions against at least three of the defendants.[7]

The second factor to consider is whether the prosecution's misconduct caused serious and incurable prejudice to the defendants. The news article that the jurors read contained prejudicial information as it disclosed Valentine's identity, his motive for refusing to testify, and the incorrect contents of his statement. This disclosure caused the mistrial because it informed the jurors of damaging inadmissible evidence. But see *Commonwealth v. Palmer,* 276 Pa.Super. 473, 419 A.2d 555 (1980). In our system of justice, a verdict cannot be based on inadmissible evidence; rather, it must be based on "evidence and argument in open court, *and not by any outside influence, whether of private talk or public print." Commonwealth v. Pierce,* 451 Pa. 190, 199 ftn. 5, 303 A.2d 209, 212 ftn. 5 (1973) (Emphasis added). This is so because:

> "Jurors are of course human beings and even with the best of intentions in the world they are in the well-known phrase of Holmes and Hughes, JJ., 'extremely likely to be impregnated by the environing atmosphere.'" *Commonwealth v. Pierce,* 451 Pa. 190, 199 ftn. 5, 303 A.2d 209, 214 ftn. 5 (1973).

As human beings and not machines, the jury was "extremely likely to be impregnated" by the prejudicial nature of the prosecution's disclosure. *Id.*

---

7. According to one of the briefs, Valentine's statement actually implicated *three* and not all of the defendants, as was reported in the news. See Brief for Appellants Bryant and Ross at p. 4.

Next, it is appropriate to examine whether the prosecutor's conversation with the reporters was in defiance of any "direct order or clear admonition by the trial court". *Commonwealth v. Clark*, 287 Pa.Super. at 392, 430 A.2d at 661. In the instant case, the court ordered an in camera proceeding relative to the possibility of Valentine testifying. By definition, that proceeding was "not open to the public." Black's Law Dictionary 684 (5th Ed. 1979). Furthermore, the trial court's statement in open court, infra at 6–7, clearly indicated that the matter was to be "considered out of the presence of the public". (N.T. 120) This writer equates the prosecutor's divulgence of information to the press, who had been excluded from the in camera proceeding by the court, as equivalent to defiance by the prosecutor of a direct court order. But see *Commonwealth v. Potter*, supra.

The prosecutor attempts to neutralize the serious nature of his misconduct by contending that although he disclosed information in a conversation with the press, it was "background information" and was not for print. A review of the record, however, also reveals an absence of any neutral explanation (i.e., trial strategy, inadvertence, or inexperience) for the prosecutor's conduct. To begin with, the prosecution's tactic was not proper trial strategy. See DR 7–107; See also ABA Standards Fair Trial and Free Press § 1.1, Comment 1.1 at 82–84 (Tent. Draft, December, 1966). Additionally, his explanation is an admission that the information was not given inadvertently.[8] Another admission

---

**8.** The full text of the prosecutor's explanation consisted of the following:

"So, right at the conclusion of that, the granting of that mistrial, I gave them the *background information* as to what had transpired. There were no cautionary instructions, and at that time I didn't feel that anybody was going to be violated in any of their rights. Because she [the news reporter] had been up to that moment a lady, acted like a lady, and Mr. Atzinger [the other news reporter], I may add, was a gentleman at that time and remained a gentleman at all times and they were in a quandary as to what the procedural aspects of it were, I explained it to them. Now we go into the second trial, and in the interim—I think it's in the interim—the Supreme Court of the United States had issued a new ruling indicating that in various in camera proceedings the Court could specifically exclude media

established that he should have known the information given to news reporters in the heat of the trial "would [be] expect[ed] to be disseminated by means of public communication". See DR 7-107. The following admission by the prosecutor also negated any possibility that his inexperience could explain his conduct:

> Q   Where did you confront Barbara Stack White? [the Post-Gazette reporter]
>
> A   Before I answer that question specifically, I think that it is important for the Court to have a background before we reach the conversation that took place. During the second trial on these various rapes, homosexual rape assaults, firstly, *it has been my philosophy that lawyers should not publicize or engage in any type of conversation or activities with media people because they have always completely distorted and smeared names and stories all over the place, and I have been the victim of this over a period of time.* If anybody should not speak, I have to plead to this Court that I should not. With that in mind, Barbara White Stack came to my office on a number of occasions prior to the trial of the first case, and she acted

people, and there had been a hue and cry all over the country about that. During the course of the second trial, it became necessary to have an immunity hearing in which Judge Mannix specifically excluded the media people. So, they were wandering out there in the halls. As I came out of the courtroom, Barbara White Stack immediately approached me. Mr. Atzinger was near her, and because of the manner in which she had treated these matters, I have to plead guilty of being a gentleman. I just couldn't walk away from her. Mr. Atzinger was there. I immediately cautioned them that I felt sorry that they couldn't be in the courtroom, that those were the rules, but I would tell them what happened and under no circumstances were they to use this in any type of a newspaper article and attach my name to it. This was simply for their *background information* that they would be able to use at the conclusion of the case. Then I went on further to explain what happened. Most of those quotes are accurate, and you can tell from the informality of the statements that I was placed in that position, in that posture of being informal, being off the Record. That's exactly what happened, and I am now to the point where I certainly don't want to violate any rules of any prosecutorial overreaching. I had no intention. This was simply a total violation and a breach, and I consider Ms. White Stack's conduct in this entire matter reprehensible." (N.T. 10/11/79, at pp. 25-26) (emphasis added).

like a lady, and I related to her what my philosophies were and further related to her that on a number of occasions she would receive information that would be of a background nature. During this period of time, she appeared to act like a lady in that total and complete regard. Now, in the first trial, there were no cautionary instructions, and a mistrial was made simply by virtue of the motion of the defense counsel, which in my judgment should not have been granted by the Court." 10/11/79, p. 24. (emphasis added).

Under these circumstances, the prosecutor's conversation with the reporters about the case in litigation, in which he disclosed prejudicial information, constituted deliberate prosecutorial misconduct. See *Commonwealth v. Pierce*, 451 Pa. 190, 303 A.2d 209 (1973).

With respect to the last factor to consider (i.e., the trial court's observations concerning the prosecutor's motives), the record shows that the court was inclined to believe that the prosecutor's actions were not deliberate. In a colloquy with one of the defense counsels, the court said:

"Now, as I understand the testimony in this case, and I don't but generally, the prosecutor revealed this information under, I think, apparently a hypothesis on his part. He was only giving *background information*, and he didn't really expect it to be published. However, in fairness to the reporters involved, he didn't say he didn't want it published, as I understand it. There's no evidence he said, 'I don't want this published.' So, it could have been a combination of Mr. Stanichak relying on something in good faith that he may not have had a right to rely on and the reporters relying on the fact that he didn't instruct them not to publish. So, by a possible misunderstanding on the part of Mr. Stanichak, not deliberately, but misunderstanding how he had presented this and what he himself considered to be the basis of his presentation but not making it clear to the media, this results. Now, it resulted in a situation that you agreed with Judge Mannix on. He had to grant the mistrial, and you had to move for it to

protect your client. Now, you're saying this has to be intentional, that we have to find that Mr. Stanichak did this intentionally?" 10/11/79, pp. 58–59. (emphasis added)

Even though the trial court's observations as set forth above are relevant to an inquiry into bad faith intent on the part of the prosecutor, it does not follow automatically that the trial court's observations are conclusive where the *record* supports a finding of prosecutorial overreaching.[9] See *Commonwealth v. Virtu,* 495 Pa. 59, 432 A.2d 198 (1981); see also *Commonwealth v. Clark,* supra. Those observations are but one of a number of factors to consider in evaluating the prosecutor's actions.

*Commonwealth v. Virtu,* supra, is controlling on that issue. In *Virtu,* the prosecutor "denied any intention to cause a mistrial or to seek unfair advantage by causing the witness to assert his Fifth Amendment privilege before the jury. He claimed that his intended questions at trial went no farther than those asked and answered at the suppression hearing." *Id.,* 495 at 65, 432 A.2d at 201 (footnote omitted). The trial court accepted the prosecutor's version of the facts and concluded that the prosecution "did not deliberately provoke a mistrial...." *Id.,* 495 at 65, 432 A.2d at 202. On appeal, our Supreme Court reversed and said that "Fagan [the prosecutor] knew, or should have known, that under the decisions of this Court, his alleged 'good faith' belief in the invalidity of a witness'[s] contemplated assertion of his Fifth Amendment privilege was irrelevant." *Id.* Similarly, in the instant case, the prosecutor should have known that his

---

**9.** Additionally, this writer is mindful of the Supreme Court's "reluctanc[e] to mandate dismissal of charges against this or any defendant in the absence of a completed fact finding procedure." *Commonwealth v. Virtu,* supra, 495 Pa. at 69, 432 A.2d at 203. Accord *Commonwealth v. McElligott,* 495 Pa. 75, 432 A.2d 587 (1981). In the instant case, a hearing was held to determine if the prosecutor's conduct barred retrial, and a record of that proceeding was made. The trial court's observations and the contents of the in camera proceeding are also of record. Under these circumstances, this writer considers the fact-finding procedure to have been completed even though the trial court did not make a specific finding as to whether he believed the prosecutor or the reporters.

divulgence of information to the press was improper and might surface in public print.

To reiterate, the observations of the trial court are relevant but not conclusive of the retrial issue. In the instant case, where the evidence of guilt was not overwhelming, the prosecutor's conduct caused serious and incurable prejudice to the defendants, there was an absence of any neutral explanation for the prosecutor's conduct, and the prosecutor defied a direct order of court, this writer concludes that appellants may not be retried.