556 A.2d 870
**COMMONWEALTH of Pennsylvania**
v.
**James W. GAINS, Appellant.**

Superior Court of Pennsylvania.

Argued Dec. 20, 1988.
Filed March 29, 1989.

Peter Rosalsky, Assistant Public Defender, Philadelphia, for appellant.

Joann Verrier, Assistant District Attorney, Philadelphia, for Com., appellee.

Before CIRILLO, President Judge, and BROSKY, McEWEN, DEL SOLE, MONTEMURO, BECK, TAMILIA, POPOVICH and JOHNSON, JJ.

MONTEMURO, Judge:

This is an appeal from an order of the Court of Common Pleas of Philadelphia County, wherein the court determined that double jeopardy does not bar retrial of the appellant, James W. Gains. We affirm.

Appellant was charged with arson, aggravated assault and related offenses following an early morning fire which occurred in an apartment building located in the Abbotts-

ford area of the City of Philadelphia.[1] Appellant's jury trial on these charges commenced on June 11, 1986. Testimony during the trial revealed that three of appellant's stepchildren, Anthony Harris, Michael Harris, and Brenda Chandler, resided together in an Abbottsford apartment at the time of the fire. Their mother, Hattie Gains, was married to appellant but had separated from him. She had apparently been living intermittently with her children at the Abbottsford address.[2] Michael Harris testified that during the week prior to December 16, 1985, his stepfather asked him to tell his mother to call the appellant. Thereafter, according to the testimony of Anthony and Michael Harris, appellant came to their apartment building and, upon learning that Hattie Gains did not wish to speak with him, appellant stated that "the consequences of what happened will be on her." (N.T., June 11, 1986 at 41.)

Anthony Harris was awakened on the morning of December 18, 1985, by what he described as a "crash." He then observed flames at a window on the second floor of the Abbottsford apartment: "... the curtains were starting to burn and the walls [were] starting to smoke and burn." (*Id.* at 44). Following the "crash" noise, Anthony Harris also recalled hearing a car "driving off" and the "neighbors hollering." (*Id.* at 55). Anthony and his brother Michael, with the help of a neighbor, were able to extinguish the fire. Hattie Gains, who was not staying at the Abbottsford apartment on the night of the fire, testified that when Michael Harris told her that the appellant had thrown a fire bomb into the apartment, she phoned the appellant and accused him of attempting to kill her children. According to Hattie Gains, appellant responded by stating: "This is war. I'm going to kill all [of] you...." (*Id.* at 104). She testified that approximately fifteen minutes after the phone

1. Appellant was charged with four counts of aggravated assault, and was also charged with recklessly endangering another person, incendiary device, arson, and risking a catastrophe.

2. At the time of the fire, Hattie Gains had been separated from the appellant for approximately one year. At the time of their separation, she had moved to Baltimore, Maryland, but had later returned to Philadelphia to live.

conversation, her husband was banging and kicking her door, telling her to come outside because he had something for her. (*Id.* at 105).

A police officer who arrived first at the scene of the fire advised Anthony Harris that he believed that the fire had been caused by electric candles in the window. This police officer did not testify at appellant's trial. Lt. Carr of the Philadelphia Fire Marshall's Office did testify. After arriving at the apartment shortly following the fire, Lt. Carr entered the living room and noted the odor of gasoline. In addition to determining that the origin of the fire was located under the windowsill, Lt. Carr discovered pieces of broken glass and a wick in that area of the room. Lt. Carr expressed his opinion as to the cause of the fire in the following words:

> There was an incendiary device. It was thrown into the living room breaking the window. The bottle itself breaks a part (sic), the gasoline that was in the bottle and on the wick burned to extend the fire from the bottle to burn the wall and windowsill and the window.

(*Id.* at 133).

Later in the morning of December 18, 1985, appellant was stopped by Philadelphia police, while driving in a car apparently owned by a friend. Officer Leslie Edward Gunther testified that he detected a strong odor of gasoline in the car. The police later discovered a pile of clothing, wet with gasoline, and two pieces of copper tubing in the passenger compartment of the car.

Appellant's sister, with whom appellant resided, testified that appellant was asleep in her home during the time that the fire was allegedly set. Appellant took the witness stand and denied any involvement in the fire. He testified that he had told his stepson to ask his wife to contact him because he had some insurance money he wanted to share with her. (N.T., June 12, 1986 at 54). Appellant testified that he was driving to see his wife in the early morning hours of December 18, 1985, because, after receiving a phone call from his wife, he believed that she was in trouble

and needed help. Appellant did not notice the smell of gasoline in the car which he was driving. (*Id.* at 61). Following closing arguments [3] and instructions from the court, the jury retired to deliberate.

The trial court later received the following note from the foreperson of the jury, wherein she communicated the following concerns regarding a fellow member of the jury, Mr. Turner:

> Mr. Turner was manager of the Abbottsford Projects during the time Mr. and Mrs. Gains were tenants there and had dealings especially with Mrs. Gains and knew Mr. Gains. Although he stated initially that he could make an impartial judgment, we are unable to ascertain whether this judgment may be colored.

(*Id.* at 140–141). The trial court then summoned Mr. Turner for questioning. Mr. Turner admitted that he was familiar with the faces of Mr. Gains and Mrs. Gains, because he had seen them "in and about the [Abbottsford] projects" even though they were not "bonafide (sic) tenants." [4] (*Id.* at 140, 142). Mr. Turner, however, denied having direct dealings with the appellant or with his wife. Mr. Turner informed the court that what he had offered to the other jury members was his knowledge concerning the lifestyle of the people, in general, who resided at the Abbottsford apartments.

The court then questioned the jury foreperson who explained what had prompted her note to the court:

3. Appellant acknowledges that his theory concerning the events which led to the fire is "complex." Brief for Appellant at 9. Appellant presented the following theory to the jury during closing arguments: ... there was not one, but two fires. The first fire was an accidental electrical fire, but Anthony Harris mistakenly believed that appellant had intentionally started it. When the first police officer who arrived at the scene did not subscribe to Anthony Harris' accusation that appellant started the fire, and after Michael Harris left the apartment to visit his mother, Anthony Harris used gasoline to start a small second fire to solidify a case against the appellant. *Id.*

4. Mr. Turner stated that he did not actually remember Mr. Gains and Mrs. Gains until he was leaving the courtroom for deliberations. (N.T., June 12, 1986 at 160).

... We [the jury] were talking about Mrs. Gains being fearful, perhaps why she went to Baltimore or Maryland, wherever she went ... and was there any instance of fear there. Then Mr. Turner said, "Fear? That woman don't have any fear, the many times she's stomped through my office. She doesn't have any fear." He made that statement. There was something else. I can't think what the other thing was. That was the main thing though, because I ask him, "Do you know her?" He said, "yeah, I know her." Oh! And then a couple of the other jurors said that they were on the elevator with Mr. Turner and that he saw someone and he said, "My buddy"—now buddy, when the word buddy is used, it doesn't have to be used for anybody that you really know, sometimes you just be talking about somebody and say that buddy or whatever. But he said to someone, "A buddy of mine is here for arson."

(*Id.* at 148). When the trial judge informed the jury foreperson that Mr. Turner had explained his statements to the other members of the jury as mere descriptions of the general lifestyle of the persons living in the Abbottsford apartments, and that Mr. Turner had denied knowing Mr. and Mrs. Gains personally, the jury foreperson responded as follows:

This sounds a little conflicting now. It seems as though one impression was given in there and another thing or impression was said out here. It sounded in there—and perhaps maybe you should call maybe another juror out to get their opinion also—but it sounded to me in there that he had dealings with her in terms of management tenant.

(*Id.* at 149–150). Over the objection of defense counsel, who argued that neither Mr. Gains or Mrs. Gains had indicated that they knew Mr. Turner [5], the trial court declared a mistrial on its own motion, "out of a sense of

5. The trial court did not question Mr. Gains or Mrs. Gains concerning their previous contacts with Mr. Turner. Counsel did inform the court that both Mr. Gains and Mrs. Gains denied having been tenants at the Abbottsford apartments. (N.T., June 12, 1986 at 138).

manifest necessity." (*Id.* at 156). The court stated that a fair trial was impossible because, *inter alia*, "Mr. Turner allegedly knew the Commonwealth's witness, Mrs. Gains, far more that he indicated here." (*Id.*) Following the mistrial, appellant filed a motion to be discharged, contending that retrial was barred by double jeopardy. Specifically, appellant argued that there had been no manifest necessity for the *sua sponte* declaration of a mistrial. The motion was argued before the Honorable James D. McCrudden on April 27, 1987.[6] The court denied appellant's motion and filed an Opinion in this matter on September 1, 1987. Appellant has filed this appeal in a timely manner.

Before we may address the merits of appellant's contention that double jeopardy bars his retrial, we must determine whether or not this appeal is properly before us. The Supreme Court of Pennsylvania has determined that an immediate appeal may be taken from an order denying a pretrial motion to dismiss on double jeopardy grounds. *See Commonwealth v. Bolden*, 472 Pa. 602, 373 A.2d 90 (1977) (plurality); *Commonwealth v. Haefner*, 473 Pa. 154, 373 A.2d 1094 (1977). The *Bolden* plurality opined:

> The basic purpose of the double jeopardy clause mandates that a defendant who has a meritorious claim have an effective procedural means of vindicating his constitutional right to be spared an unnecessary trial. Acquittal upon retrial or belated appellate recognition of a defendant's claim by reversal of a conviction can never adequately protect the defendant's rights. The defendant is deprived of his constitutional right the moment jeopardy attaches a second time. His loss is irreparable; to subject an individual to the expense, trauma and rigors incident to a criminal prosecution a second time offends the double jeopardy clause. The clause establishes the "right to be free from a second prosecution, not merely a second punishment for the same offense." *Fain v. Duff*, 488 F.2d 218, 224 (5th Cir.1973).

**6.** The Honorable Marvin R. Halbert had presided over appellant's jury trial.

*Commonwealth v. Bolden, supra* 472 Pa. at 631–632, 373
A.2d at 104–105. Subsequently, in *Commonwealth v. Brady,* 510 Pa. 336, 508 A.2d 286 (1986), the Court recognized
the need for a rule to prevent the use of a frivolous double
jeopardy claim as a tool to disrupt and to delay the functioning of the criminal trial process:

> The stay of a criminal trial pending appeal necessitates
> what may be lengthy delays in the prosecution of the
> defendant. The availability of an automatic stay upon
> filing a *Bolden* appeal encourages the use of frivolous
> appeals as a means of avoiding prosecution. The trial
> court should not be powerless to prevent such intentional
> dilatory tactics.... The needless delays engendered by
> frivolous appeals hinder the administration of justice as
> well as the public interest.

*Id.,* 510 Pa. at 346, 508 A.2d at 291 (citations omitted). The
*Brady* Court set forth a specific procedure, designed to
balance the double jeopardy rights of the criminal defendant with the significant interest of the public in securing
prompt trials for the criminally accused. The *Brady* rule
requires that the criminal defendant initially present his
double jeopardy claim to the trial court. In the event that
the double jeopardy claim is "... obviously frivolous, an
interlocutory appeal will serve only to delay prosecution."
*Id.,* 510 Pa. at 345, 508 A.2d at 291. Consequently, "an
appeal from the denial of a motion to dismiss on double
jeopardy grounds should not be permitted where the hearing court has considered the motion and made written
findings that the motion is frivolous." *Id.,* 510 Pa. at 346,
508 A.2d at 291.

In the instant case, the trial court did not make a
written finding that appellant's double jeopardy claim is
"frivolous." Instead, the court reviewed the merits of
appellant's claim and determined that the ending of appellant's jury trial in a mistrial was supported by manifest
necessity. The fact that the trial court determined that
appellant's retrial was not barred by double jeopardy cannot
be construed as a determination, on the part of the trial

court, that appellant's double jeopardy claim is "frivolous." A frivolous claim is a claim clearly and palpably without merit; it is a claim which presents no debatable question. Such futile claims, presumably interposed for the mere purposes of delay or disruption, are to be expressly identified by the trial court through a written finding. The defendant may then opt to request a stay from the Pennsylvania Supreme Court to preliminarily challenge the trial court's written finding of frivolousness and may secure appellate review of the double jeopardy claim on direct appeal following retrial. *Id.*, 510 Pa. at 345, 508 A.2d 291. *See also Commonwealth v. Learn*, 356 Pa.Super. 382, 386, 514 A.2d 910, 911 (1986) (in a request for a stay in the context for which *Brady* provides, the Superior Court would lack jurisdiction to issue a writ of prohibition).

■ Thus, in view of the fact that we presently have no written finding by the trial court that appellant's double jeopardy claim is a frivolous one, we exercise jurisdiction over this appeal. The trial court certainly had the benefit of the *Brady* decision and could have made a finding of frivolous if it had deemed such a finding warranted. *Commonwealth v. Keenan*, 365 Pa.Super. 437, 440 n. 3, 530 A.2d 90, 91 n. 3 (1987). We now expressly overrule the decision of a panel of this Court in *Commonwealth v. Learn, supra,* to the extent that it holds that where a trial court fails to make a written finding of frivolousness, a remand will be ordered to afford the trial court an opportunity to determine whether such a finding should be included in the record.

Finally, we note the importance of our exercise of jurisdiction in the case at bar. Where the trial court has rejected a criminal defendant's double jeopardy claim which is at the least "colorable" or "arguable", access to appellate review is imperative. Otherwise, the risk is simply too great that the criminal defendant will be deprived of his right to be free from an unnecessary retrial with its accompanying "... expense, trauma and rigors incident to a criminal prosecution for the second time...." *Common-*

*wealth v. Brady, supra* 510 Pa. at 340, 508 A.2d at 288 (1986) (citation omitted). We must not lose sight of the balance which *Brady* was intended to establish.[7]

■ We may now turn to the merits of appellant's double jeopardy claim. The decision to declare a mistrial rests

**7.** The dissent has expressed the view that we have misconstrued the intent of *Commonwealth v. Brady* by requiring that a trial judge make an express finding that a double jeopardy claim is frivolous. The dissent is apparently convinced that the better approach would be to ascertain the intent of the trial judge on this issue by examining the Order, Opinion and record as a whole. In the interests of judicial economy and because we are bound to follow the clear precedent of *Brady,* we strongly disagree.

The focus of our Supreme Court's decision in *Brady,* and our focus presently, is not upon the presence of the written word "frivolous" in a trial court's opinion or order. The focus is upon an express *determination* on the part of the trial court that a double jeopardy claim is frivolous, meaning clearly and obviously without merit. When a trial court deems a double jeopardy claim to be a frivolous claim, likely interposed not with the hope of securing relief but as a means to delay and disrupt, the court will enter this finding into the record and no appeal will lie. In this way, the intent and purpose of *Brady* will be realized and the criminal trial process will not be unduly delayed.

As we have stated, the distinction between a "frivolous" double jeopardy claim and one which is colorable or arguable, although ultimately rejected by the trial court, is crucial. In the case at bar, the dissent states that this case "establishes a basis for asserting a finding by the motion judge that the double jeopardy claim is frivolous...." Dissenting Op. at 877. There is nothing in the record before us to support such an assertion. On the contrary, the trial court, in its opinion, carefully reviewed the unusual circumstances in this case, where the mistrial was declared after the jury had retired to deliberate. The court, acknowledging that the testimony of Mr. Turner and the jury foreperson was contradictory, nevertheless found manifest necessity for the mistrial. Further, the court emphasized in its opinion that the trial judge is in the best position to evaluate the propriety of a mistrial. Thus, in addition to the lack of an express finding of frivolousness, there is nothing in the trial court's written opinion to suggest that it found appellant's double jeopardy claim to be obviously frivolous. The trial court, in our view, considered and treated appellant's double jeopardy claim as colorable.

Under the balance established in *Brady,* the present case is precisely the type of case in which an appeal should lie. If this were not the case, the balance would tip too far in favor of the public's interest in prompt criminal trials. We must strive to preserve the balance established by the *Brady* decision between the public's interests and the equally significant interests of the criminal defendant who holds a constitutional right to be protected from double jeopardy.

within the sound discretion of the trial judge and we, as an appellate court, will not reverse absent a flagrant abuse of discretion. *See Commonwealth v. Reardon*, 374 Pa.Super. 212, 217, 542 A.2d 572, 574 (1988); *Commonwealth v. Thomas*, 346 Pa.Super. 11, 17, 498 A.2d 1345, 1348 (1985). However, where a mistrial is declared by the trial court on its own motion, the Double Jeopardy Clauses of the United States and Pennsylvania Constitutions bar retrial absent manifest necessity. *Commonwealth v. Bolden*, 472 Pa. 602, 373 A.2d 90 (1977); Pa.R.Crim.P. 1118(b). The finding of "manifest necessity" can only be made on a case-by-case basis. *Commonwealth v. Stroup*, 244 Pa.Super. 173, 180, 366 A.2d 1248, 1251 (1976). We are mindful that doubts concerning the necessity of a mistrial must be resolved in favor of the defendant. *See Commonwealth v. Haefner*, 264 Pa.Super. 144, 399 A.2d 707 (1979). "On appellate review of the lower court's finding of manifest necessity, the circumstances of the trial must be examined to determine if any doubt exists regarding the propriety of the exercise of the discretion by the lower court." *Commonwealth v. Smith*, 324 Pa.Super. 156, 471 A.2d 510 (1984) (citations omitted).

■ We are convinced that the circumstances of this case presented the manifest necessity required for the *sua sponte* declaration of a mistrial. The trial court received a letter from the jury as a whole, signed by their elected foreperson, stating that the jury doubted the impartiality of one of its members, Mr. Turner. Upon a questioning of the foreperson as to the reason for the note, it was evident to the trial court that the jury had been exposed to *specific* and prejudicial information concerning the character and past conduct of Mrs. Gains, and perhaps of the appellant, which had not been a part of the evidence presented in the courtroom. Both of these individuals testified during the trial and, moreover, as is apparent from our summary of the evidence that was presented, Mrs. Gains was a significant part of the entire case. When the trial judge advised the foreperson of how Mr. Turner had explained his state-

ments to the trial judge, the foreperson advised the judge that quite a different impression had been communicated to the jury members by Mr. Turner concerning his knowledge of Mrs. Gains and Mr. Gains. Under these circumstances, the trial court could not ignore the information provided by the jury foreperson.

In *Commonwealth v. Anderson*, 294 Pa.Super. 1, 439 A.2d 720 (1981), this Court held that manifest necessity to declare a mistrial existed where the jury had been exposed to newspaper articles concerning trial witnesses during the course of the trial. We stated in *Anderson* that "[t]he jurors must base their decision solely upon the evidence and arguments that they hear in the courtroom, but a decision that was untainted by the newspaper articles could not be reached in the instant case." *Id.*, 294 Pa.Superior Ct. at 6, 439 A.2d at 722 (footnote omitted). The same considerations apply to the case at bar. Obviously convinced that the jury had been exposed to outside influence, such that a verdict could not be rendered only upon the evidence and argument as presented in open court, the trial court had no choice except to declare a mistrial. Further, it is the trial judge who is in the best situation to evaluate the necessity of a mistrial. *Gori v. U.S.*, 367 U.S. 364, 81 S.Ct. 1523, 1524, 6 L.Ed.2d 901 (1961).

Finally, we note that, in declaring a mistrial, the trial court "was insuring that appellant would receive a trial by a fair and impartial jury which would return a verdict based solely on the evidence adduced at trial. This is an interest which is to be protected not only for defendants, but also for the public, which has a compelling interest in justice for all." *Commonwealth v. Wilson*, 257 Pa.Super. 329, 333, 390 A.2d 847, 849 (1978) (citation omitted). Without a fair tribunal, appellant could not receive a fair trial.[8]

---

8. Appellant's contention that the trial court could have simply disqualified some of the jury or could have used cautionary instructions in lieu of declaring a mistrial must fail. The information from Mr. Turner was communicated to all of the jury members during deliberations. Under these circumstances, it would have been nearly impossible for the jurors to separate what they had learned from Mr. Turner

For all of the foregoing reasons, we affirm.

Order affirmed.

TAMILIA, J., files a dissenting opinion.

TAMILIA, Judge, dissenting:

I respectfully dissent as the trial judge was correct in declaring a mistrial, as evidenced by the strong factual situation expounded by the majority. Clearly, this case required the trial judge to call a mistrial, *sua sponte*, out of manifest necessity, as the motion judge unequivocally ruled. I am not certain that overruling *Commonwealth v. Learn*, 356 Pa.Super. 382, 514 A.2d 910 (1986), is the proper course as we now send a message that if trial judges do not pronounce the word "frivolous" in a written statement in a double jeopardy case, an appeal will lie. It is hornbook law that we look to the Order, decree, findings, Opinion or record as a whole to ascertain the intent of the trial judge. Recently, the Supreme Court in *Commonwealth v. Devers*, 519 Pa. 88, 546 A.2d 12 (1988), revisited a long line of Opinions by Superior Court which interpreted *Commonwealth v. Riggins*, 474 Pa. 115, 377 A.2d 140 (1977), in sentencing procedures, holding that Superior Court carried language dictates to the point of absurdity in requiring trial judges to state on the record "the thought processes by which he arrives at a particular sentence" (*Devers, supra* 519 Pa. at 98, 546 A.2d at 16) and rejected Superior Court remand where "the trial court appears to have fulfilled the fact-finding responsibility but not the explanation responsibility." *Id.*, 519 Pa. at 102, 546 A.2d at 18. In rejecting this constricted approach, the Supreme Court said: "We

from the evidence that was presented in the courtroom. *See Commonwealth v. Anderson*, 294 Pa.Super. 1, 6, 439 A.2d 720, 722 (1981). Finally, the trial court acted within its discretion in not questioning other jury members prior to declaring a mistrial. The jury foreperson represented the jury as a whole and she did not alter her account of what had prompted the note to the trial judge, even when faced with the fact that Mr. Turner's statements to the judge contradicted her own. On the contrary, the foreperson told the judge that, in her view, Mr. Turner was telling two different stories about what he knew of Mr. and Mrs. Gains, one to the jury and one to the court.

criticize them again, for we fail utterly to see how, based on the Superior Court's own statement of the case above, it is at all rational to believe that the sentencing judge could not have been so informed as to have arrived at a balanced judgment." *Id.*, 519 Pa. at 102–103, 546 A.2d at 19. Just as we were criticized in *Devers* for circumscribing *Riggins*, I believe we are subject to the same criticism here for misconstruing *Commonwealth v. Brady*, 510 Pa. 336, 508 A.2d 286 (1986). Since I believe the case, as analyzed by the majority, clearly establishes a basis for asserting a finding by the motion judge that the double jeopardy claim is frivolous as the rulings of the trial judge as to the manifest necessity for a new trial permitted no other result, I would remand with instructions to the trial court to make such a determination or to proceed as though such a determination had been made.

My reading of the majority Opinion is that it holds there is no frivolousness finding because the trial judge failed to file a written statement that it was frivolous (Majority Opinion, p. 217). This leads me to believe that if the trial judge had found the claim to be frivolous, in a written statement to that effect, the majority would have quashed the appeal as being interlocutory. I do not believe *Brady, supra,* intended our review of an appeal on double jeopardy issues, which serves to delay a retrial, turn on whether or not the trial judge failed to say in so many words that the claim was frivolous. If the record clearly shows the claim to be frivolous and the trial judge, as here, clearly found the claim to be without merit and allowing for no other conclusion, we should recognize it as such and not resolve the issue on the merits, since to do so distorts the lesson of *Brady.* I acknowledge the majority has quoted language from *Brady* which would lead to the conclusion the trial court must state with specificity, in writing, that the appeal was frivolous in order to impose the *Brady* rule. However, this narrow interpretation, when viewed against the overall intent of *Brady*, almost effects a return to *Commonwealth v. Bolden*, 472 Pa. 602, 373 A.2d 90 (1977), which *Brady* sought to correct.

I agree with the Commonwealth that although this case came before the Court en banc because of an apparent conflict between *Learn, supra,* and *Commonwealth v. Keenan,* 365 Pa.Super. 437, 530 A.2d 90 (1987), there is in fact no conflict, as in *Keenan,* the trial court indicated the issue of double jeopardy had some merit and an appeal would be proper, whereas in *Learn,* the motions judge left no room to assume that an appeal would be anything but frivolous.

For the sake of judicial economy, I would find the trial court's determination was sufficient for this Court to conclude the appeal is frivolous and remand for a new trial.